# REPORTS

OF

## CASES ARGUED AND DETERMINED

AT

## JUNE TERM, 1838.

HAGAN, et al. *vs.* CAMPBELL AND CLEAVELAND.

1. The rights of riparian proprietors, depend upon the fact, whether the land is bounded by a river where the tide ebbs and flows : or whether it lies along a stream above tide water.

2. In the first case, the right of the owner to the soil, at common law, extends to high water mark, only.

3. The shore below the common tide, belongs to the public : though by grant, it may become vested in the citizen.

4. The rule, that a country bounded by a river, extends to the point of low water, *it seems*, does not apply to the case of a grant by the public, to an individual.

5. At common law, the grantee of lands, (from government,) bounded on tide water, is not allowed to extend his riparian rights beyond ordinary high water mark :—such grants are construed favorably to the grantor, as a trustee for the public ; and no alienation will be presumed, not clearly expressed.

6. Riparian proprietors are entitled to all accessions made, to the lands granted, either by the retreating of the river from its

8 P.                    2

Hagan, et al. *vs.* Campbell and Cleaveland.

former limits ; or by the slow and secret deposit of sand, or other substances.

7. The beds of navigable streams, as well as the sea, are the property of the public : and if, by the instantaneous casting up of sand, or other substances, the water is thrown back, and an addition is made to the land—the public may claim the accession.

8. *Secus*, if the accession be slow and secret, when it becomes the property of the owner of the adjacent lands.

9. Where the term " river," is used in a grant, as a boundary— high, or low, water mark must be intended—not a middle point.

10. A plat or plan of survey may be referred to in a grant, and become part of it ;—showing the proper lines, and ascertaining the locality.

11. Where a line is described in a grant, as running towards one of the cardinal points, it must run directly in the course, unless controlled by some object.

12. And where the distance marked out in a plat, can not be included by allowing the lines to deviate, the grant which refers to the plat, must be construed to mean, that the lines shall be extended without a variation of course.

13. Ignorance of *fact* by a grantor, in regard to assertions in a grant, describing undeserved merit to the grantee, will not control the language of the grant, or limit its operation in favor of one, not claiming under a subsequent grant from the same source.

14. Where, in a grant of lands, bounded by a river, a free passage or road is reserved,—such reservation does not prevent the freehold of all the lands embraced in the grant, from vesting in the grantee ; or limit his riparian rights :—the *use* of the road only is reserved.

15. *It seems*, that where accretion is made impracticable, without the authority of government, by the labor of a third person,—excluding the water from its former limits,—such third

Hagan, et al. *vs.* Campbell and Cleaveland.

person is a trespasser, and can derive no profit from his labor : In such case, his labor inures to the benefit of the riparian proprietor.

16. The grant made by the British government, in seventeen hundred and sixty-seven, to William Richardson, of a certain tract of land in the district of Mobile, on the west side of the river Mobile, conferred on the grantee, in that grant, a title to high water mark, only.

17. But the confirmation of that grant to John Forbes & Co. in eighteen hundred and seven, conveyed to the grantee, *all* the lands lying east of the original tract, to the channel of the river.

18. And to embrace *all* the intervening soil, the north and south lines of the original tract,—held, properly to run, without variation of course, from high water mark, to the margin of the channel.

19. By these grants, and each of them, there was conferred upon the grantees, or their assignees, the right to the gradual increase of soil by the receding of the river.

20. Whether one, who does not own lands, adjacent to a river, where the tide ebbs and flows, may, for the benefit of commerce, erect a wharf or other improvement, between high and low water mark, *quere.*

21. Though it is clear, no part of such erection can rest on the land of another person, nor can the latter be excluded from the use of the water, or be denied, his riparian rights.

This was an action of trespass to try title, prosecuted by the plaintiffs in error, in the Circuit court of Mobile county; and tried before *Harris*, J. The plea was, not guilty; and issue being joined, a verdict was rendered in favor of the defendants.

From a bill of exceptions taken at the trial, it appeared that the plaintiffs gave in evidence to the jury, a grant and survey, (a copy of which accompanied the bill,) and

Hagan, et al. *vs*. Campbell and Cleaveland.

proved that the same had been confirmed by an act of Congress, of the third of May, eighteen hundred and nineteen, and deduced title to themselves by mean conveyances under the grant. It was proved that the defendants had, before the commencement of the action, built a wharf upon the ground, for the recovery of which, the same was brought, and at the institution of the suit, held the possession. It was also shewn, that at the date of the grant, the ground occupied by the defendants was covered with the water of the river or bay of Mobile;—whether the ground ever had been uncovered by water, was not clearly shown, inasmuch as the evidence was contradictory. Evidence was adduced to show that John Forbes & Co. the original grantees, had reclaimed, by ditching and otherwise, a portion of the land originally covered with water, but it did not show that their reclamations extended to the wharf and land in possession of the defendants. Evidence was offered by the plaintiffs, tending to show that the southern boundary of the tract embraced by the grant, if extended to the channel of the river Mobile, in the same direction in which it strikes the water, would include the land and wharf occupied by the defendants, but evidence was given by the defendants, showing that the wharf and land sued for, lay below a straight line drawn from the point where the southern line struck the river at high-water mark and the channel of the river, and if a line was run from that point at high-water mark, directly to the channel, the land in controversy would not be embraced.

"The court instructed the jury, that by the terms of

the grant, the eastern boundary of the tract is the river. Its termination is a question of law. A grant extending to the river, where the tide ebbs and flows, terminates at high-water mark, unless by its terms, it be extended further. The land between high and low-water mark, that is, between the flow and ebb of the tide, belongs to the sovereign, and does not pass by a grant, unless specially given. Such lands as you may find to have been drained by John Forbes & Co., and to have been reclaimed, passed by the grant. If, from the evidence, you believe that the land for which this suit was brought, was at the date of the grant covered by the waters of the river or bay of Mobile, and that it was not subsequently reclaimed by the plaintiffs, nor those under whom they claimed, and that by the terms of the grant, it was not extended further than to the river Mobile; then it is the opinion of the court, that the plaintiffs have no right to recover the premises in question. The court instructed the jury, that the land lying between high and low-water mark, that is, between the ebb and flow of the tide, did not pass by the grant under which the plaintiffs claim, but that if the land, which, at the date of the grant, lay between high and low-water mark, that is, between the ebb and flow of the tide, had been reclaimed by the grantees, so that the water of the said river Mobile had been excluded from it, in that case, the plaintiffs might recover the land thus reclaimed, by virtue of the grant." To all which, the plaintiffs excepted, &c.

The grant referred to, in the bill of exceptions, was dated at Pensacola, the twenty-fifth day of September, eighteen hundred and seven, and made by the Intendant

of the Province of West Florida, to John Forbes & Co.
By this grant, it was shown that the British government,
in seventeen hundred and sixty-seven, granted to William
Richardson, a tract of land situate in the District of Mo-
bile, on the west side of the river Mobile.    That in se-
venteen hundred and seventy-four, Pantan, Leslie & Co.
purchased of William Richardson, the tract embraced by
the British grant, and that John Forbes, (a partner of the
house of Pantan, Leslie & Co., then continued under the
firm of John Forbes & Co.) by his memorial to the tribu-
nal of the Intendancy of West Florida, asked a confirma-
tion of his title.    The grant, after reciting the reference
of the memorial and its accompanying documents, to the
appropriate officers of the Spanish government, and their
action thereupon, proceeded as follows:

"It is therefore declared that this house, John Forbes
& Co. should be protected, as by the present decree they
are protected, in the possession of the said tract of land,
so that in no time to come they can be molested or dis-
turbed in their possession of the same, on account of its
being royal domain; with which intention, the corres-
ponding title should be issued to them in the ordinary
form, and consequently, the "plat" or figurative plan
made by Don Josef Collins, the assistant surveyor, to be
corrected, as is done by Don Vincente Sebastian Pintado,
the surveyor-general of this province, in the copy which
he has made of it, with the certificate which follows ;
by which it appears that the two hundred and sixty-
three English acres, reduced to the geodetic measure of
this province, compose three hundred and ten arpents,
seventy-seven and one-eighth perches of Paris, consisting

Hagan, et al. *vs.* Campbell and Cleaveland.

of eighteen lineal perch of said city, and one hundred superficial perches to the arpent, superficial measure, according to the received custom of these provinces; and by the process of survey made the second of May, eighteen hundred and two, by said Collins, it is shewn that the tract of land in question is situate in the district of Mobile, on the west side of the river, a quarter of a league, more or less, to the north of the fort, and terminated by the bank of said river on the east side, and bounded on the north by lands of Jeremiah Terry, said now to be royal domain, on the south by vacant lands, and a lot belonging to said house, (John Forbes & Co.) and according to information on the west by lands of G. Fisher and others, which are said to belong to the royal domain; and although in the foregoing plan, copied from the original made by Don Josef Collins, there is an error in the reduction of acres into arpents, supposing two hundred and eighty of the last to be equal to two hundred and sixty-three of the first ; as also an error in the superficies of the trapezium, which figure said land represents ; which, according to its dimensions, contains two hundred and eighty-seven arpents. Nevertheless, it must always be understood, in order that it may never operate to the prejudice of the party interested, that the said two hundred and sixty-three English acres, are equal to the three hundred and ten arpents seventy seven and one-eighth perches aforesaid, as calculated by the surveyor-general ; and the distance, in the plat marked out, as being from the river to the limits (east) of the land, and left unsurveyed at that period, being impassable, has since been rendered useful,

by the owners having ditched and drained the same, and which they are to receive in compensation for the above mentioned error; with the reserve, however, of leaving a free passage on the bank of the river, without altering the figure of said tract on the other side. Whereupon, exercising the power which the King, our Lord, (God preserve him,) has confered on me in his royal name, I confirm and ratify, to the before mentioned John Forbes & Co., the possession of the three hundred and ten arpents and seventy-seven perches and one-eighth of land, which are superficial, and contained in the plat, number one thousand eight hundred and nine, with the correction made by the surveyor-general, in order that they may, as their own property, possess, sell, or dispose of the same, at their own free will and pleasure, (provided it does not interfere with the claims of a third party,) with the condition that they have to observe and comply with the land regulations made and published by this Intendancy, on the seventeenth of July, seventeen hundred and ninety-nine, or as far as it relates to the local situation and quality of the land. In testimony, &c."

The copy of the survey corresponded with that described in the grant, both as to its number, and the figure of the tract. On it were traced lines, shewing the eastern boundary of the British grant, and from the points where the northern and southern lines strike this boundary, they were continued without deflection, to the channel of the river. And the marsh or flat lying between the channel and the high water mark in seventeen hundred and sixty-seven, was clearly described in the plat.

Hagan, et al. *vs.* Campbell and Cleaveland.

[In order to elucidate the case, the Reporter has added a copy of the plat, taken from the Spanish grant, made part of the bill of exceptions.

By act of Congress of 1819, all claims.to land, founded on complete grants from the Spanish government, reported to the Secretary of the Treasury by the commissioners from the districts east and west of Pearl river, &c. were recognised and declared valid—(See 3 Story's U. S. Laws, 1748, s. 1, 2.]

Hagan, et al. *vs.* Campbell and Cleaveland.

No. 1809.

Hagan, et al. *vs.* Campbell and Cleaveland.

*Hopkins*, for plaintiffs in error.
*Thornton*, contra.

*Hopkins*, for plaintiffs in error, relied on the following points:

1. That the Spanish grant made low-water mark the eastern boundary of the tract—(Co. Litt. Tit. Confirmation, Lib. 3 ch. 9, sec. 515, note 1, page 295; and sec. 521, note 1, page 297; 6 Cowen, 281; 4 Com. Dig. (E. 12) 546, and (G. 4) 54.

2. That the effect of the direction in the grant, to preserve the figure of the tract, is to continue the northern and southern lines to the channel of the river, in the same direction, in which they run to the high-water mark—(1 John. 156; 5 Wheat. 375; 6 Cranch, 237.

3. If the eastern limit of the tract had not been changed by the Spanish grant, the grantee would have a right by accretion, to all the land which might be left, below the original high-water mark, and above what might become at any time the high-water mark, by a change of the high and low-water marks; but the right to such accretion is merged by the Spanish grant, into the right of the sovereign, to all the land there may be at any time above what may be low-water mark—(10 Peters' R. 662, 717, 721.)

4. If there had been a junior grant to the river, the effect of which, would make high-water mark the eastern boundary, a claimant under it could not, under any circumstances, acquire by accretion, any of the land between high and low-water marks, which lay within the previous grant to Forbes & Co., because such land had

been previously granted, before the junior grant was made, and consequently, before the title on which the right of accretion depends, was conveyed to the junior grantee. A government may grant to low-water mark; and if such a grant be made, it is a grant of every thing which a government is capable of granting; and the right of accretion upon a junior grant in a direction to interfere with the previous absolute grant of the same land, cannot be conferred. The government could not, by express terms, give the land between high and low-water marks, to a junior grantee, which had been previously granted to another, and such land can never be acquired by a junior grantee, in virtue of the right of accretion.

5. After a grant to such a river, the sovereign cannot grant the land between high and low-water marks to a third person, as such a second grant would destroy the right of accretion, and deprive the first grantee of his river front. But in this case, a junior grantee of land bounded by the river, might know, and had constructive notice of the fact, that he could never acquire by accretion any thing in a direction, to interfere with the land between high and low-water marks, previously granted to Forbes & Co.

*Thornton*, for defendants in error. The whole question, in this case, depends on the construction of the grant to the plaintiffs, as to the extent and direction of the southern boundary line. The question of fact is settled by the bill of exceptions, that the *locus* sued for, is below the southern line of the plaintiffs' grant, if exten-

Hagan, et al. *vs.* Campbell and Cleaveland.

ded at right angles to the *channel of the river*, from where it struck the water; and is not included in the grant thus bounded and defined.

The argument of the plaintiffs counsel is, that the grant is to the channel of the river, including *all water* and *land*, between its nothern and southern lines—*exten-ded* in the same *undeviating* course, from their commence-ment, as in the old English grant, to the *channel of the river*.

We contend for the defendants in error—

First—That the last, or supplemental grant, contain-ed, in addition to what was embraced by the first, such lands as had been actually reclaimed by the grantees, at the date of said supplemental grant. If this construc-tion should be accorded, the proof was, that the land thus reclaimed was all above, or north of the ground sued for. For this point, we merely ask the attentive examination by the court, of the *whole grant.*

Secondly—We contend, that if the grant was intended to embrace water, or ground covered with water, as well as actually reclaimed ground, then it was only such *space*, as would be contained between the northern and southern lines extended to the river, which is made the eastern boundary expressly, but that the grant there stopped; and that the right of riparian proprietor only, attached for any thing beyond the river to the eastward, and towards the channel.

The court below, as I understand it, (and so it seems the opposite counsel understand the charge,) recognised the right of the riparian proprietors, as to all reclama-tions in *front* of his land; but charged that the grant

Hagan, et al. *vs.* Campbell and Cleaveland.

extended only to the river as its eastern boundary, that is, to high-water mark.  The error imputed to the court below, is refusing to charge, that the grant ought to be construed, as if it had expressly said, that the grantees should have and possess all the land and water contained between the north and south lines of the original grant, *extended* in the same unvarying course throughout their whole extent, to the channel of the river.  Now, admit that the sovereign can grant the *shore*, that is, the space between high and low-water mark, and *the water of the river* to the channel,—which it would seem has been done, and sustained by the English Judges; yet, by all the authorities, nothing can be taken by *intendment*, against the sovereign in his grants; but they must be construed strictly—(6 Peters' R. 738; Dyer a 362, a; Cro. Car. 518; 11 Peters' R. 421.)  I feel assured, that the express terms of the grant do not go to the extent contended for.  All the purposes and motives of the grant, as declared on its face, are accomplished without this construction; and it is so unjust, that it ought not to be *presumed* to have been *intended*, even if it could be supported by *intendment*.  The *benefit of the water* is a natural advantage, intended for those who own the contiguous soil, or *terra firma*, and ought to belong to all who border upon it, in proportion to the extent of that border.  In the nature of things, the riparian proprietorship has reference to *the water*, and not to the *shape* or quantity of land extending back from the *marginal basis*.  If the rights of the riparian proprietor are referable to the fact of his owning the contiguous land, that is, as arising from such ownership of the marginal soil,—

Hagan, et al. *vs.* Campbell and Cleaveland.

then the absurdity of the doctrine, that those rights are at all dependent upon, or to be affected by, the course of his other boundary lines, can be easily exposed. Suppose, at the bend of a river, the marginal proprietor, A, should claim the extension of his lines in the same course, as when they strike it, as in the following diagram*

he would deprive all the reparian owners, B, C and D, of any rights of accretion, piscary, waifs, &c. though they are liable to have all their property swept off by the stream, from all benefit of which, they are thus excluded. Now, by the rule for which we contend, and seek to apply to the case in hand, no such inequality in the enjoyment of the advantages of nature will result.

For the principles applicable to artificial improvements, as were the wharf, &c. of the defendants, see Angel on Tide Waters, page 125 to 163.

* NOTE.—In reference to the ingenious position of *Thornton*, of counsel for the defendants in error, as explained by the diagram, it is not understood, that this case settles the doctrine of riparian rights, as they stand uncontrolled by the express terms of a grant. What might be the decision in a case where the boundary of land was high-water mark, and where no grant of land below that point, was made,—is yet unsettled. The argument of *Thornton* would certainly present a strong view, if the court were called upon to settle the riparian rights of several owners, by the principles of relative justice: But in the present case, the right of the plaintiff in error was derived from the express terms of the grant; and therefore settled upon its construction alone.

REPORTER.

COLLIER, C. J.—In order to a solution of the questions of law arising upon the record, we will inquire—

*First*—What was the true eastern boundary of the land embraced in the grant made by the British government?

*Second*—What was the additional extent of the confirmatory grant made by the Spanish authorities?

*First*—The record contains no copy of the British grant, and to ascertain its terms, we must refer to that made by the Spanish authorities, in which it is recited. From that, it appears that the land was situated in the then district of Mobile, "on the west side of the river Mobile."

The rights of riparian proprietors are diverse, depending upon the fact, whether their land is bounded by a river, where the tide ebbs and flows; or whether it lies along a stream above tide water. In the former case, the right of the owner to the soil, according to the common law, extends but to high-water mark—(3 Kent's Com. 344, and Angell on Tide Waters, 68.) The shore below the common tide belongs to the public, though by grant, it may become the property of the citizen—(3 Ib. 347.) But in Arnold vs. Mundy, (1 Halsted's R. 1,) it was determined, that a grant of land lying upon navigable water, reached only to high-water when the tide was at its flow, and to low-water mark when it had receded, thus diurnally changing the extent of the owner's right. And in Handley's lessee vs. Anthony, (5 Wheat. R. 374,) the court considered that the cession by Virginia to the United States, of all her right to the territory "situate, lying and being to the north-west of the river of Ohio,"

was a relinquishment of title to the land lying above low-water mark on the north-western bank of that stream, and the case would not be varied, " if, instead of an annual and somewhat irregular rising and falling of the river, it was a daily and almost regular ebbing and flowing of the tide." The rule, that a country bounded by a river would extend to low-water mark, " has (say the court) been established by the common consent of mankind. It is founded on common convenience." Whether the rule recognised in that case would have have been considered applicable to a grant made by the public to an individual, the opinion does not inform us— but we suppose that it would not.

It is, however, unnecessary to enquire, what has been the course of judicial decision in the United States upon this subject; for the grant of seventeen hundred and sixty-seven, must be expounded with a reference to the English common law, as applied in Great Britain and her dependencies. And that system of jurisprudence, according to all authority, does not allow the riparian owner, under a grant from government, of lands *bounded on tide water*, to go beyond *ordinary high* water mark— (Storer vs. Freeman, 6 Mass. R. 438; Cortelyou vs. Van Brundt, 2 Johns. R. 357.) The rule which determines this to be the extent of the grantee's interest, is founded upon the principle, that such grants are construed most favorably for the sovereign; and derives force from the consideration, that public grants are made by a trustee for the public, and no alienation should be presumed, that was not clearly expressed.

Though the proprietor or his assignees under the

British grant, acquired no title to the soil lying between high and low-water mark, yet they were entitled to all accessions made to their land, either by the retreating of the river from its former limits, or by the slow and secret deposit of sand or other substances, so as to leave the soil theretofore inundated, uncovered by water—(Angell on Tide Waters, 68; 3 Kent's Com 344, *et post.*)

In New Orleans vs. the United States, (10 Peters' R. 717,) "the question is" said to be "well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded, is subject to loss by the same means which may add to his territory; and as he is without remedy for his loss in this way, he cannot be held accountable for his gain." The beds of navigable streams, as well as the sea, belong to the public. And if by the instantaneous casting up of sand or other substances, the water is thrown back and an addition made to the land, the sovereign may claim the accession, upon the ground that it was but a part of the bed of the river or sea, of which he was the proprietor. But if the increase was occasioned by a process so slow and secret, as renders it impossible to discover how much is added in each moment of time, it belongs to the proprietor of the land to which the addition is made—(Angell on Tide Waters, 68; 3 Kent's Com. 345; and the King vs. Lord Yarborough, 3 Barn. & Cress. R. 91.) The civil law, from which the common law on this subject is copied, says, "what the

Hagan, et al. *vs.* Campbell and Cleaveland.

river adds by alluvion to your estate, becomes yours by the law of nations. Alluvion is a latent increase. That seems to be added by alluvion, which is so added by degrees that you cannot know how much in each moment of time—(Angell on Tide Waters, 69.) And to the same effect is the very learned and elaborate argument of Mr. Livingston, (and the cases therein cited,) in regard to the Balture at New Orleans—(2 Am. Law Journal, 326, 330.)

Without extending to greater length our enquiries upon this branch of the case, we think it is sufficiently shown that the British grant only conveyed to its grantee a title to the land above high-water mark, with a right to the gradual accessions by alluvion, &c.—(Bullock vs. Wilson, 2 Porters' R. 436; see a note by the Reporter, 6 Cowen's R. 536, 541, *et post;* and 10 Peters' R. 662.)

*Second*—The Spanish grant, after stating the boundaries of the land conveyed by the British government to William Richardson, and that it lies on the west side of the river Mobile, and is " terminated by the bank of said river on the east side"—shows a deficit in the number of acres proposed to be granted, and continues, " Nevertheless it must always be understood, in order that it may never operate to the prejudice of the party interested, that the said two hundred and sixty-three English acres are equal to three hundred and ten arpents, seventy-seven and one-eighth perches aforesaid; and also that the distance described in said plat or plan of survey between the river and the limits (east) of the tract, and which was left at the time unsurveyed, it being then impassable, has since been rendered useful by the owners having ditched and drained the same, and which they are to re-

ceive in compensation for the above-mentioned error, with the reserve, however, of leaving a free passage on the bank of the river, and without altering the figure of the tract on the other side," &c. Here is a clear grant of all the soil lying between the tract first granted and the river, designated upon the plat or plan of survey accompanying the Spanish grant. Where the term " river" is used as a boundary, either high or low-water mark must always be intended, and not some middle point. The land embraced by the British grant is " terminated by the bank of said river (Mobile) on the east side,"—by the "east side," we are to understand the *eastern boundary of the tract*, and not the eastern margin of the river. It is, then, clear, beyond controversy, that the grant of seventeen hundred and sixty-seven, extended to the river, which, as already shewn, was high-water mark.

The grant of eighteen hundred and seven, reaches not only to the eastern limits of the first grant, but embraces " the distance in the plat marked out as being from the river to the limits east of the land, and left unsurveyed at that period, (1767) &c. and which they (John Forbes & Co.) are to receive in compensation for the above-mentioned error," &c. Here, again, " the limits east of the land," mean the eastern boundary of the British grant— "the river" evidently refers to some point below high-water; for if high-water mark were intended, there would have been nothing additional granted, as the first grant extended thus far.

If all the soil lying east of the British grant and the channel of the river, had been expressly granted, there then could have been no controversy as to the extent of

the claim of Forbes & Co. And is not their title as clearly made out by the proof, as it would then have been? The marsh lying between the land covered by the grant of seventeen hundred and sixty-seven and the river, is described in *a plat or plan of survey accompanying, and made part of the grant of eighteen hundred and seven,* and together with the land embraced by the former grant, is all conveyed to the grantees. This marsh either then was, or had been subject to inundation by the flowing of the tide, and by the manner in which it is described in the *plat,* must have been at least a part of it below high-water mark in eighteen hundred and seven. Here, then, the Spanish government, in terms not at all dubious, have granted the *soil between the original tract and the river.* The original tract, we have seen, had for its boundary on the east, high-water mark. What distance, then, could have been described in the *plat or plan of survey,* but the land lying between high-water and the channel of the river? *Besides,* the copy of the survey accompanying the record, indicates as clearly as possible that the intervening space was marsh or flat land, partially inundated, and that it extended to the stream, even when the tide had receded.

*The north and south lines, running from west to east, are plainly traced on the plat, and continued without any deflection, from the point at which they strike high-water mark, across the marsh to the channel of the river.* Here is a conclusive indication of what land was embraced by the survey. A *copy of the plat, or plan of survey,* we have seen, is made part of the grant; so that the grant of eighteen hundred and seven must be regarded as quite

Hagan, et al. *vs.* Campbell and Cleaveland.

as explicit an indication of the eastern limits of the tract, as if it had *in totidem verbis,* transferred to John Forbes & Co. *all the land lying between the north and south lines, extended east to the channel of the river.* This single view is decisive of the case, as presented by the record; but least it may appear upon another trial, that the plan of survey now before us, is not a correct copy of the original, it will be proper to consider the case in reference to such a contingency.

Even if the original plat or plan of survey should not discover a continuation of the northern and southern lines of the *original tract,* drawn east to the margin of the channel of the river; yet, inasmuch as it designates the marsh lying between high and low-water, and the grant of eighteen hundred and seven relinquishes to John Forbes & Co. the part of the marsh lying east of the land embraced by the British grant, " *in compensation*" for a deficiency between the land intended to be thereby granted, and that received by the original grantees,—these lines must be run without deflection from high-water mark to their eastern *termination.* How else could *all* the land east of the British grant and west of the river be embraced ? There is certainly no warrant for maintaining, that less than all, was relinquished to the grantees in eighteen hundred and seven. If these lines should diverge, then they would embrace a larger quantity of land than lies east of the tract, but if they should converge, then the quantity would be less. So that the only way in which the Spanish grant can operate according to its terms, is for these lines to continue an unvarying course to their termination.

Hagan, et al. *vs.* Campbell and Cleaveland.

That it is competent for a grant to refer to a plat or plan of survey, in order to ascertain the locality and lines of the land, is a proposition, which it is supposed no one will dispute. In Jackson *ex dem.* Livingston vs. Freer, (17 Johns. R. 29,) it appeared that a large tract of land was granted by the commissioners of the land office—it was described by its exterior lines alone, and a survey directed to be made by the surveyor general—and patents were to be issued for the several lots according to the return and map of such survey. The survey and return was made, and patents issued describing the several lots by reference to the map of the survey on file in the office of the Secretary of State. It was held, that the patents were to be understood as referring not only to the map on file, but also to the field book of the actual survey.

And it is well settled, that where a line is described as running towards one of the cardinal points, it must run directly in that course, unless it is controlled by some *object.* Thus, in Brandt. *ex dem.* Walton vs. Ogden, (1 Johns. R. 156,) it was determined, that "the term *northerly* in a grant, where there is no object to direct its inclination to the east or to the west, must be construed to mean *north*, and there being no object to control, it must be a due north line."—(See also Jackson *ex dem.* Woodworth vs. Lindsay, 3 Johns. R. 86; Jackson *ex dem.* Clark vs. Reeves, 3 Caine's R. 293.) As "the distance in the plat marked out as being from the river to the limits east of the land," cannot be included by allowing the north and south lines to converge, and as divergent lines are not authorised, the grant of eighteen hundred and

seven, must be construed as directing an extension of these lines to the river, without variation of course.

It is not essential to the plaintiffs title, to show that all the marsh was drained previous to eighteen hundred and seven, or that it had been reclaimed since that period. It is true, that all this is described in the Spanish grant, as having been rendered useful by the owners having ditched and drained the same, and which they are to receive in compensation for the *deficit* in the quantity intended to be conveyed by the British grant. That the Spanish authorities believed that the marsh, or the greater part of it, lying between the river on the east, and the original tract on the west, had been drained, we think probable, from the terms employed. Yet an ignorance of fact, in this particular, can not be held to control the plain language of the grant, and limit its operation to so much of the land as was actually drained ;—most certainly not in a controversy with a mere occupant, who relies upon no title subsequently acquired from the authorities of Spain. The plat or plan of survey does not trace any ditch as having been cut through the marsh; and the river being declared to be the eastern boundary of the land covered by the grant, there is no authority for stopping at any point between the channel and high water mark.

The reservation of a free passage on the bank of the river, did not prevent the freehold in all lands described in the plat or plan of survey from vesting in the grantees—the title vested charged with the servitude. The free passage was subject to be changed by the grantees, or their assignees, as the river might gradually recede

from its limits, so as to continue it along the bank. Nor can the fact of a road running along the bank of a navigable river, be held to limit a grant having the river for its boundary, so as to exclude its proprietor from riparian rights; and in this case there cannot be the slightest pretence for such an idea. The *freehold* in the land over which the road run, did not continue in the Spanish government;—*that* was transferred by the grant, while its use only was to be enjoyed by the public— (Cortelyou vs. Van Brundt, 2 Johns. R. 351.) And the title to all the soil lying between the original tract and the river, having passed by virtue of the grant of eighteen hundred and seven, to John Forbes & Co., and of course to his assignees, they immediately became entitled to the right to alluvial formations, in the same manner as other riparian proprietors are, on navigable streams.

But even supposing that the Spanish grant only conveyed the title, to what was known as high-water mark, at the time it was made, the plaintiffs then would have been entitled, as riparian proprietors, to every increase of land by alluvion. And if accretion is made impracticable, without the authority of government, by the labor of some third person excluding the water from its former limits,—shall such third person, who was himself a trespasser, derive a profit—or shall not he who has been deprived of an increase of soil by natural causes, enjoy what art has reclaimed? We merely propound this inquiry—the view we have taken of the case does not render its solution necessary. We need not consider whether, if the present were a controversy for land made by alluvion, the north and south lines should not take the

8 P.            5

Hagan, et al. *vs.* Campbell and Cleaveland.

nearest course from high-water mark to the river.   And it is alike profitless to inquire whether one who does not own the adjoining land, may erect a wharf or other improvement for the benefit of commerce, between high and low-water mark, since it is clear that no part of such erections can be rested upon land of a third person, nor can such third person be excluded the use of the water, or denied other riparian rights.

The grant of eighteen hundred and seven, speaks its own meaning, with so much distinctness, as to relieve us from an examination of the doctrine in regard to the construction of public grants.   The rule, that where there is *any doubt*, the construction is made most favorably for the public, is not denied, but its application is limited—it applies only in cases of real doubt—(See Charles River Bridge vs. Warren Bridge, et al. 11 Peters' R. 544—in which the learning on the subject is exhausted.)

Our conclusions, upon an examination of the plaintiffs title, are—

1. That the British grant transfers the title to high-water mark only.

2. That the Spanish grant confirmed the former, and in addition, granted *all* the land lying east of the original tract, to the channel of the river.

3. In order to embrace *all* the intervening soil, the north and south lines of the original tract must run without variation of course from high-water mark to the margin of the channel.

4. Either grant conferred upon its grantees, or their assignees, the right to any gradual increase of soil by the receding of the river.

Hagan, et al. *vs.* Campbell and Cleaveland.

The judge of the Circuit court was of opinion, and so instructed the jury, that the grant of eighteen hundred and seven, only transferred the title to high-water mark on the east; unless the marsh had been reclaimed previously, or subsequently, by John Forbes & Co. or those claiming under them. The instructions, we have shown, cannot be sustained—the grant ascertains its own limits on the east, which is not liable to be varied by showing a portion of the marsh, or even all of it, unreclaimed in eighteen hundred and seven, or at any time since.

The judgment of the Circuit court must consequently be reversed, and the cause remanded.

GOLDTHWAITE, J. not sitting—having been of counsel.