# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT

### OF THE

## STATE OF MINNESOTA,

#### AT NOVEMBER SPECIAL TERM, 1858.

———◇———

*In the matter of the Application of the MINNESOTA & PACIFIC RAILROAD COMPANY, for a Mandamus, against H. H. SIBLEY, Governor of the State of Minnesota, to compel him to issue State Bonds to said Company.*

In construing a Statute or Constitutional provision, the great object is, to ascertain and interpret so as to carry out the intention of the law-giver; and as a primary rule, the language used is to be first considered as being the best evidence of what that intention is ; and when the words are clear, explicit, unambiguous and free from obscurity, Courts are bound to expound the language according to the common sense and ordinary meaning of the words.

That clause of the State Constitution (as amended by a vote of the people, on the 15th day of April, 1858,) which reads as follows : "And as a further security, an amount of *first mortgage bonds*, on the roads, lands and franchises of the respective companies, corresponding to the State Bonds issued, shall be transferred to the Treasurer of the State, at the time of the issue of State Bonds," does not give to the State an *exclusive lien* on the roads, lands and franchises of the respective companies to the extent of the bonds which may be received from them ; and it is not necessary that the Deeds of Trust executed by the companies, under the amendment, shall specify a priority of lien to such bonds as the companies may deliver to the State in exchange for her bonds.

Mr. Justice Flandrau dissents—and holds, that as the words, "*first mortgage bonds*," as used in the clause referred to, are doubtful in their meaning, they must receive that interpretation most favorable to the State. That public grants are to be construed most favorably to the grantor, for being made by a trustee of the public, no alienation should be presumed that is not clearly expressed. That the value of the securities the State is to receive for her bonds cannot be depreciated by implication. That the companies were negotiating for a sum certain, and agreed to give an amount of first mortgage bonds on their roads, lands and franchises, corresponding to the State Bonds issued to them. And that the Trust Deeds should specify a priority of lien in favor of the State.

This was an application by the " Minnesota and Pacific Railroad Company," for a Writ of Mandamus to compel the Governor of the State of Minnesota to issue bonds to said Company, under the provisions of the State Constitution, (as

3

amended) providing for the loan of the credit of the State, &c.

The Company claimed that they had complied with all the requirements of the Constitution, in the securities tendered to the State, while the Governor claimed that the Deeds of Trust given to secure the "*first mortgage bonds*," should specify a priority of lien to such bonds as the Companies might deliver to the State, in exchange for her bonds. This demand is resisted by the Company, who deny that the State is entitled to an exclusive preference as to these securities.

JOHN B. BRISBIN, for Minnesota & Pacific Railroad Company.

CHARLES H. BERRY, Attorney General.

·*By the Court.*—L. EMMETT, Chief Justice. This proceeding grew out of a difference of opinion between the Governor of the State, and the Railroad Companies, as to the requirements of Section 10, of Article 9, of the Constitution as amended by a vote of the people, on the 15th day of April, A. D. 1858. The clause material to the matter in controversy, is in these words :—" And as further security, an amount of first mortgage bonds, on the roads, lands and franchises of the respective Companies, corresponding to the State Bonds issued, shall be transferred to the Treasurer of the State, at the time of the issue of State Bonds."

This language, in the opinion of the Governor, gives to the State an exclusive lien on the roads, lands and franchises of the respective Companies, to the extent of the bonds which may be received from them, and in the words of his written requirements, he insists on " a deposit of first mortgage bonds, of the Companies, made to the State, based upon a Deed of Trust to the State, equal in amount to the State Bonds issued to such Companies, which Deed of Trust shall specify a priority of lien to such bonds, as the Companies may deliver to the State in exchange for her bonds." On the other hand, the Companies deny that the State is entitled to any preference as to these securities. The Minnesota and Pacific Railroad Company having tendered and offered to transfer to the Treasurer of the State first mortgage bonds at the rate of one hundred thousand dollars for every ten miles of its road, then completed

and ready for the superstructure, secured by a Deed of Trust on its road, lands and franchises, and demanded of the Governor that he cause to be issued and delivered to said Company a corresponding amount of State Bonds, which he refused to do, makes the application for a peremptory Writ of Mandamus.

It is admitted that the Company has strictly complied with the provisions of its Charter, and of the Constitution, in all, save that the Trust Deed, given to secure its first mortgage bonds, does not express a preference, as to such bonds as may be transferred to the State. This Trust Deed conveys the road, lands and franchises of the Company to certain trustees, to secure the payment of bonds issued, or to be issued, for the construction of the fifty miles of its road, then contracted to be built, and such other of its bonds as might thereafter be issued under certain restrictions, amongst which are the following, to wit : Whenever, and as often as the construction of forty additional miles of said road, or its branches, shall be contracted for, additional bonds may be issued for said construction, not exceeding the rate of thirty-five thousand dollars per mile, and so on as the work progresses, until the road is completed. The bonds are all to be made payable at the same time, must be countersigned and registered by the trustees, and bear a rate of interest not exceeding seven per cent. per annum.

From this, it will be seen that the question to be determined is not as has been insisted, whether the Company can issue bonds *ad libitum*, and thus depreciate and destroy the security given the State by the clause under consideration ; for the Trust Deed expressly limits the amount of the issue, and it was not claimed that the utmost limit allowed exceeds the actual cost of constructing and equipping the road. Doubtless the Courts would interfere to prevent the depreciation of the securities by fraudulent issues of bonds. Here, however, the real question is, whether the State legally or equitably, has a right of priority over all others who may expend labor or money in the construction or equipment of this road. It seems clear, that such a claim could not commend itself very strongly to the favor of a Court of Chancery, and it should follow in all such cases, that the legal right to such undue preference, must be clearly made to appear before it can be admitted.

In giving construction to this Section of the Constitution, we will be aided, by recurring to the condition of that instrument before it was amended, and considering the occasion, the necessity and the object of the change. We shall then be better able to determine the precise meaning of the language employed. Prior to the amendment, the State was prohibited from loaning its credit in aid of any individual association or corporation. The Constitution was ratified by the people, when submitted to them, with marked unanimity, as much perhaps out of regard for it as a whole, and to put to rest the vexatious questions of regularity, which attended its formation, as from any peculiar favor with which each particular provision was viewed. Congress had previous to this made a munificent grant of lands to the Territory, to aid in the construction of certain lines of railroads, and a Territorial Legislature had disposed of these lands to certain Railroad Companies. These several Companies had duly organized, and most if not all of them had located their respective roads. Scarcely had the people passed upon the Constitution in this form, before the financial embarrassment into which the whole country was thrown, made it apparent to all, that unless these roads received some assistance from the State they could not be built, and the land grant would thus be lost to us. To secure this Governmental aid, and to prevent so great a misfortune as the loss of the land grant, a change in the fundamental law was deemed necessary, and accordingly the Legislature then in session, passed an act in accordance with Section 1, of Article 14, of the Constitution, proposing so to amend Section 10, of Article 9, as to authorize the State to loan its credit to the several Railroad Companies having possession of this grant of lands. This proposition was duly submitted to the people for approval or rejection, and was adopted by a majority quite as decided as that given for the Constitution in its original form, showing that, whatever would have been the result on the provision as it stood originally had there been an opportunity to vote on the proposition separately, they were at last satisfied that a change was necessary. Certain it is, that they gave unequivocal expression to their desire that the State should loan its credit, in aid of these lines of railroads. The first paragraph of the

Section expresses the object of the change to be "for the purpose of *expediting* the *construction* of the lines of railroads, &c," and in this the State has an interest scarcely inferior to that of the Companies themselves, not an antagonistic interest, but in perfect harmony with the interests of the Companies.

The Section is now in these words, "The credit of the State shall never be given or loaned in aid of any individual association or corporation, except that for the purpose of expediting the construction of the lines of railroads, in aid of which the Congress of the United States has granted lands to the Territory of Minnesota. The Governor shall cause to be issued and delivered to each of the Companies in which said grants are vested by the Legislative Assembly of Minnesota, the special bonds of the State, bearing an interest of seven per cent. per annum, payable annually at the City of New York, as a loan of public credit, to an amount not exceeding twelve hundred and fifty thousand dollars, or an aggregate amount to all of said Companies not exceeding five millions of dollars, in manner *following*, to wit :"

The Section then proceeds to declare what it is necessary for the several Companies to do, in order to obtain the State Bonds. Provides for the manner in which they shall be issued, pledges the faith and credit of the State for the payment of the interest and the redemption of the principal. And after requiring each Company to make provision for the punctual payment of the principal and interest, provides that " *as security therefor* the Governor shall demand and receive from each of said Companies, before any of said bonds are issued, an instrument pledging the net profits of the road, for the payment of said interest, and a conveyance to the State of the first " two hundred and forty sections of land, free from prior incumbrances, which such Company is, or may be authorized to sell in trust for the better security of the Treasury of the State from loss on said bonds," and authorizing the Governor to make title to such lands to certain purchasers. Then follows that portion already quoted. As has before been stated there can be no reasonable doubt that the end and object of the amendment, taken altogether, was " for the purpose of expediting the construction of these lines of railroad," and it seems equally clear that the

design of the clause under consideration was to provide the
State with a certain *class* of securities in addition to those
already designated as the security required of the Companies
for the punctual payment of the principal and interest of those
bonds.   The language refers to the kind and not to the suffi-
ciency of the security.   This clause then should be so construed
as not to defeat the object of the Section itself; and a majority
of the Court holds that the construction contended for, by the
Governor, has a direct tendency to that end.   Nothing certainly
could more effectually deter capitalists from investing in these
roads, than to find that notwithstanding they may furnish, as
in this instance, five-sevenths of the money necessary to con-
struct and equip these roads, the State may nevertheless have
a lien on everything, which may be enforced to the loss perhaps
of their entire interest.   We cannot now object to the suffi-
ciency of the securities provided: all we can do is to require
that they be of the kind and class contemplated.

The language is, that " as *further* security, an amount of
first mortgage bonds, on the roads, lands and franchises of the
respective Companies," &c.   Ordinarily, "first mortgage bonds"
are simply bonds secured by the first mortgage.   Is there any
thing to show that the words mean anything more as here
used ?   We think not. . Had it been the intention to give a
priority of lien to the State, the term " first mortgage" only,
would undoubtedly have been used, which would have left no
room for doubt.   Again, the words " an amount of," preceding
the term " first mortgage bonds," evidently implies a portion
only of a greater amount, and necessarily a remainder after
the transfer to the State.   What is that remainder, or how can
it be ascertained or limited ?   Some light may be thrown on
these questions by reference to the mode of procedure common
among Railroad Companies.   It is usual for such Companies
after surveying and locating their roads, to make careful esti-
mates of the costs of building and stocking the same, and then
if sufficient money is not raised otherwise, to provide for the
issue of bonds, based upon these estimates, to raise money to
build and equip them.   These bonds are secured by a mortgage
on the road and franchises, and are called first mortgage bonds.
They are from time to time put into market and sold as the

exigencies of the roads may require. This course is much in favor, as it gives to all who furnish money to build or equip the roads an equal lien upon the securities, and is considered necessary to success, as it would be next to impossible to obtain money to stock a road, if it were encumbered with a prior lien for the cost of construction. If from any cause these bonds are exhausted, and more money is required, a second mortgage is sometimes executed and the bonds secured by it are termed " second mortgage bonds."

The Charter of the Company making this application is framed, no doubt, with a view to just such a course to raise money as here indicated, (See Sec. 21 of the Charter,) and as this amendment of the Constitution was framed with direct reference to the Charters of the several Companies intended to be benefited, it is not difficult to believe that the words, " an amount of first mortgage bonds," refers simply to bonds of this class. When terms of art or peculiar phrases are used, it must be supposed they are used in the same sense as understood by persons familiar and acquainted with such terms. 3 *Phillip's Ev.* 1395 ; 1 *Pick.* 261.

In construing a constitution or law, the history of its passage through the Convention or Legislature, is often of great assistance, and the history of this amendment to the Constitution during its progress through the two branches of the Legislature fully sustains the position, that the State has no priority of lien as to these first mortgage bonds.

By reference to the printed journals of the two houses, (which however do not contain any proceedings had in Committee of the Whole, where most amendments are proposed and discussed,) it will be found that the bill proposing this change in the Constitution, originated in the Senate, and passed that body on the 2d day of March, 1858. On the day previous to its passage, Senator Cook' moved to amend by inserting in the clause under consideration, the following : " And the first mortgage (bonds) thus transferred to the State Treasurer, *shall be the first lien upon and take precedence* over any other bonds that may be issued, upon the first fifty miles of road which said Companies may respectively construct." This amendment was lost, and the bill was immediately ordered

to be engrossed for a third reading. *Journal of the Senate*, *pages* 266-7. Afterwards, on the 5th day of March, while the bill was pending in the House, Mr. Libbey offered an amendment, giving to the State an "*exclusive priority of all other liens*," on the roads, lands and franchises of the respective Companies, and this amendment was also rejected by a very decided vote. *House Journal* 447.

Thus it will be seen that each branch of the Legislature expressly negatived a proposition giving to the State any priority of lien as to these first mortgage bonds, and yet it is insisted that the State has this priority by implication. We think it is against the reason and spirit as well as the letter of the Constitution so to contend. Authorities were read to show that where words are doubtful in their meaning, as between the government and an individual, that construction should be given which is most favorable to the public. We have been unable, however, to discover such a degree of doubt or uncertainty in the meaning of the language used, as will make these authorities applicable to this case. On the contrary the words are explicit and free from obscurity.

In construing a statute or constitutional provision, the great object is to ascertain and interpret so as to carry out the intention of the law given; and as a primary rule, the language used is to be first considered as being the best evidence of what that intention is, and when the words are clear, explicit, unambiguous and free from obscurity, Courts are bound to expound the language according to the common sense and ordinary meaning of the words. *Broom's Legal Maxims*, 365-6-7; *Story's Com. on Const.*, 383 ; *Smith's Com. on Const.*. 627-8-9 ; 1 *Kent Com.*, 462 ; 17 *Ver.*, 479 ; 4 *Hill*, 402-3. It is only by interpolating words in the Constitution which the framers thereof expressly rejected, that any well-founded doubt can be entertained as to the meaning of the language used.

Other cases were cited to establish the old doctrine, that in a grant from the State or Sovereign to an individual, nothing can pass by implication ; but this rule however well established, can have no application to a case like the present, when nothing is asked by implication, except by the party who insists on

the rule. The rule applicable to this case is, that nothing clearly granted can be taken away by implication.

Another and insurmountable objection to the construction claimed by the Governor, is to be found in this fact: Each Company is first required to give to the State an instrument pledging the net profits of the road for the payment of the interest on these bonds, and also a conveyance of the first two hundred and forty sections of land, which it is or may be authorized to sell, in trust for the better security of the State. These two separate securities are rendered entirely unnecessary, if the first mortgage bonds mentioned are to be secured by an instrument giving them a prior lien on everything belonging to the Company. This would be to require different securities of the same nature upon the same property. It is not necessary to involve the framers of this amendment in such an absurdity. Full force and effect can be given to each of these instruments, without doing violence to the language of the Constitution, or the intention of the law-makers. They evidently intended to provide the State with an exclusive lien on the net profits of the road, and the control of the first two hundred and forty sections of land, and to place her on an equal footing only, with other creditors, as to the bonds received from the Companies. Whether the amount or character of the securities thus provided is sufficient to secure the State from loss, is of no importance in the consideration of this question, except as far as it may show the reasonableness of the construction about to be given. With this view it is not improper to notice that the State has all the security that is offered to capitalists to induce them to build and equip this road, and has in addition thereto, a pledge of the net profits, and a conveyance in trust of lands, worth, even at the government price, nearly four hundred thousand dollars, nearly one-third of the amount of State Bonds which the Company can by any possibility obtain. If therefore it may reasonably be expected, that capitalists will advance money on the securities offered to build these roads, it is not unreasonable to suppose that those who framed as well as those who approved this amendment to the Constitution were satisfied with the class of securities which the State was to receive for the simple loan of its credit. We think that the

Company has done all that is necessary under the Constitution to entitle it to the amount of State Bonds demanded, and as it is well settled, that this writ lies in all cases, when the relator, has a clear legal right to the performance of some official act by a public officer, and no other adequate and specific remedy, we award a peremptory mandamus, and direct that it be served by the Clerk of this Court or any other disinterested person, by reading and delivering a certified copy thereof if demanded.

Mr. Justice FLANDRAU dissenting, filed the following opinion:

I feel constrained to dissent from the opinion expressed by the other members of the Court in this case, and as the matters involved in the decision are of such importance to the State and the railroad interests, I deem it my duty to assign the reasons which led me to the result at which I have arrived.

The case comes before the Court on the application of the Minnesota and Pacific Railroad Company, for a peremptory mandamus to compel the Governor of the State to issue to said company the bonds of the State to the amount of three hundred thousand dollars, under and by virtue of the 10th section of the 9th article of the Constitution of the State.

The applicants show, and it is conceded by the Governor, that all the requirements of the Constitution have been complied with by the applicants, to entitle them to this amount of the State bonds, with the one exception that the bonds of the Railroad Company which are to be transferred to the Treasurer of the State, as one branch of the security which the State is to receive for its loan of credit, are not made by the mortgage which secures them, *an exclusive first lien* on the "roads, lands and franchises" of the Company—the Governor contending that such is the meaning of the Constitution. On this difference of opinion as to the proper construction to be placed upon the provision of the Constitution relative to this portion of the State security, arises the issue between the Executive and the Railroad Companies.

The provisions of the Constitution regulating this subject, are substantially as follows: That when either of the Land

Grant Railroad Companies shall have actually constructed and completed, ready for placing the superstructure thereon, any ten miles of road, the Governor shall cause to be issued and delivered to such Company, bonds of the State to the amount of one hundred thousand dollars. And whenever thereafter, and as often as either of said companies shall produce like evidence of a further construction of ten miles of its road as aforesaid, the Governor shall issue additional bonds to the amount of one hundred thousand dollars, and whenever such Company shall furnish like evidence that any ten miles of its road is actually completed, and cars running thereon, the Governor shall issue a further amount of one hundred thousand dollars to such Company, and so on, providing that for every ten miles of Railroad which shall be completed and the cars running thereon, the Company so completing shall receive two hundred thousand dollars of the State bonds, limiting the whole issue to five millions of dollars, to be divided between four companies.

For this loan of the State credit, the State is to receive the following securities, which the Constitution expresses with more clearness than any other words can: "and as security therefor the Governor shall demand and receive from each of said Companies before any of said bonds are issued, an instrument pledging the net profits of its road for the payment of said interest, and a conveyance to the State of the first two hundred and forty sections of land, free from prior incumbrances, which such Company is or may be authorized to sell, in trust for the better security of the Treasury of the State from loss on said bonds, which said deed of trust shall authorize the Governor and Secretary of State to make conveyances of title to all or any of such lands to purchasers agreeing with the respective Companies therefor."

Then follows a provision that all the moneys arising from such sales, are to be held by the State authorities to be applied to the payment of the interest of the State bonds in case of the default of the Companies, and to make a sinking fund to meet any future default of interest, and to pay the principal when due.

After which comes the provision for further security to the

State, upon the construction of which, the parties to this action differ. It is in these words: " *And as further security, an amount of first mortgage bonds on the roads, lands and franchises of the respective Companies corresponding to the State bonds issued, shall be transferred to the Treasurer of the State, at the time of the issue of State bonds.* " Does this latter provision for the security of the State, mean that the *first mortgage bonds* to be transferred to the Treasurer, shall be an *exclusive first lien* on the roads, lands and franchises of the Company, or merely a lien to be shared equally by the holders of similar bonds to the amount of twenty-three millions of dollars, which the Minnesota and Pacific Railroad Company alone propose to issue?

The term first mortgage bonds certainly in its ordinary acceptation, means an instrument by which the holder shall enjoy a first lien upon the property covered by the mortgage, which secures the bond; and were there but one bond issued, and one mortgage given to secure it, there could be no possible doubt on this subject; therefore, was a Railroad Company about to negotiate a loan from one individual, there would be no necessity for issuing more than one bond to him, secured by mortgage, unless it was for the convenience of the lender, should he desire to dispose of part of it to others.

The custom which Railroad Companies have adopted, of issuing a series of bonds of small denominations, in negotiating loans, has grown out of the necessity of distributing the loan among many where it cannot be taken by one, as well as for the convenience of the lender in putting the security in a more marketable shape.

The character of the security, therefore, to be taken for each loan which a Railroad may negotiate, is subject to the arrangement of the contracting parties, and the signification of the term *first mortgage bonds* must depend entirely upon the condition and circumstances of the contracting parties at the time of making the contract in which that term is used. For example, if a Railroad Company desired to borrow the sum of twenty-three millions of dollars, and had issued bonds to the amount secured by a first mortgage on their road, lands and franchises, and were then to offer as security for a loan of

twelve hundred and fifty thousand dollars from the State of Minnesota, or an individual, an amount of first mortgage bonds of the Company, corresponding to the loan to be received, the party lending would know exactly what the term signified when used in that connection, and the value of the bonds he was to receive, and he would admit all subsequent purchasers of the bonds to an equality of lien with himself, as he would have entered into the contract in express reference to that issue of bonds.  But it is equally clear to my mind, that if the same Company should apply to make the same loan before it had issued any bonds at all, and then offer an amount of first mortgage bonds of the Company, corresponding to the loan asked, the term would mean an entirely different thing, and preclude the idea of a greater issue of that character of bonds than sufficient to secure the particular loan under consideration, and in the latter case, the bonds would be eighteen times more valuable than in the former.  Any other view would leave the value of the security discretionary with the borrower, a position, which, to say the least, is a new feature in commercial transactions.

It is evident, therefore, that the expression is a relative and not an absolute one, and depends almost entirely for its signification upon the circumstances under which it is used, and never can have that positive and unalterable standing which the applicants in this case claim for it.

Having fixed upon this term *first mortgage bonds*, its proper force and import, and having shown that it must always be a proper subject of interpretation, depending as it does for its meaning more upon the circumstances under which it is used, than upon any definite idea conveyed by the words themselves. I will examine some of the rules by which the intention of law makers and contracting parties is to be arrived at when such terms are made use of.

The character of the parties, and the relation they sustain to each other, materially influences the rules by which their acts are to be measured.  In grants between individuals, where such terms appear, the grant is generally to be construed most strictly against the grantor. *Story on Contracts*, sec. 662.  3 *John. N. Y. Rep.* 375.  8 *John.* 394.  But on the contrary,

"public grants are to be construed most favorably to the grantor, for being made by a trustee of the public, no alienation should be presumed that is not clearly expressed." *Hagan vs. Campbell*, 8 *Port.* 9. See also the case of the *United States vs. Arvdondo et al*, 6 *Peters*, *p.* 738, where this doctrine is fully discussed, and all the cases collected. *Also, Jackson vs. Lamphire*, 3 *Peters*, 289. These cases all sustain the doctrine that nothing can pass in a grant from the sovereign to the subject by implication. It follows, therefore, that the words *first mortgage bonds*, as used in this contract being doubtful in their meaning if subjected to this test of construction, must receive that interpretation most favorable to the State, and the value of the securities the State is to receive for her bonds cannot be depreciated by implication.

In construing this provision of the Constitution, we may also look to the reason which existed for it; the motives which led to its passage; the object contemplated by it, and the circumstances surrounding its inception, are channels through which we are to arrive at the intention of its framers. In the first place, the Constitution was framed on the 29th of August, 1857, and was ratified on the 13th day of October in the same year, and clearly expressed the will of the people as adverse to lending the credit of the State under any circumstances, which refusal was embraced in the 10th section of article 9 of that instrument, in the following words: "The credit of the State shall never be given or loaned in aid of any individual, association or corporation." These four Railroad Companies had been previously incorporated, and were then in existence; they had received by grant from the Territory, the land which Congress had donated to us in aid of Railroads, and no reason existed at the adoption of the Constitution, nor had any intimation been made that they expected aid from the State in the prosecution of their enterprises. Unforseen obstacles shortly after presented themselves, which embarrassed the negotiation of loans on their securities, and resort was had to the expedient of obtaining State aid by a loan of that credit which had so recently been denied to all. It was under this condition of things that the Railroad Companies and the Government entered into negotiations. And in fixing

the relative standing of the contracting parties, I do not travel out of the proper range of judicial knowledge, as courts may well take notice of the reasons which operate to produce a change in the organic law of the State whence they derive their existence and powers.  We can but conclude, therefore, that the most jealous scrutiny would be exercised as to the character of the security to be taken in exchange for the credit of the State, and that no loan would be made without the most ample safeguards were provided that the case admitted of.  The loan and securities were agreed upon under such influences, and in my opinion, bear the most unmistakable marks of their legitimate paternity.  All the security was required that the Companies had to give, even to the pledging of the net profits of the roads.  The Company had at this time issued no bonds, as appears from the date of those tendered to the Governor, and the first mortgage given to secure them.  They were negotiating for a sum certain, and had agreed to give an amount of first mortgage bonds on the roads, lands and franchises of the Company, corresponding to the State bonds issued to them, as one branch of the State security.  This stipulation entered into under such circumstances must preclude the idea of any subsequent lender being placed anterior to, or contemporaneous with the State, in point of lien of their respective securities.  Tested, therefore, by the most liberal rules of construction applicable to individuals, the result is the same.

Having discussed generally the signification of the term *first mortgage bonds*, as used in this connection, I will look into, and endeavor to clear up the objection urged by the applicants against the position I contend for.  It is urged that the requiring of two separate instruments from the Company to the State, one pledging the net profits of the roads, and the other a conveyance of the first two hundred and forty sections of land that the Companies should be authorized to sell, conflicts with the idea that the bonds were to be *an exclusive first lien* on the roads, lands and franchises of the Company, for the reason that the bonds, were they such lien, would cover all the ground that the other instruments went over, and thus render them inoperative, producing the absurdity of giving

two securities of the same nature upon the same property; and from these premises it is argued that the only first and exclusive liens the State was to have, were those specially provided for in the first two cases, and that the number of, and quantity of first mortgage bonds was thereby left discretionary with the Company.

That this position is untenable I feel no hesitation in asserting, and think the answer to it is patent on the face of the Constitution, which provides "that in case either of said Companies shall make default in payment of either interest or principal of the bonds issued to said Companies by the Governor, no more State bonds shall thereafter be issued to said Company, and the Governor shall proceed in such manner as shall be prescribed by law, *to sell the bonds of the defaulting Company or Companies, or the bonds held in trust as above, or may require a foreclosure of the mortgage executed to secure the same.*" Here we find the reason which induced the State to exact these different characters of security. It was to provide themselves with various modes of enforcing payment in case of default on the part of the Companies in meeting the principal or interest of the bonds, more or less rigorous, as the nature of the default might require. Those provisions have reference more particularly to providing the State with adequate and appropriate remedies, than to the accumulation of securities, and it is not so certain that the first mortgage bonds being a lien on the *roads, lands and franchises* of the Company, would have given the State that control over the net profits of the roads which is secured by the special conveyance pledging them.

Great stress was placed upon the words "*an amount* of first mortgage bonds" in the argument, and it was contended with great zeal that the words "*an amount*" indicated a portion of the whole, implying that there must be a remainder after this amount was transferred to the State Treasurer, proving that the provision contemplated more first mortgage bonds than those which were to be transferred to the State.

I fail to see the strength of this position. The expression has relation solely to the value of the bonds to be transferred to the State, and means an amount corresponding in the ex-

pressed value with the amount received from the State, dollar for dollar, which were yet to be issued by the Company. If the Company, previous to the time of the negotiation, had issued the twenty-three millions of first mortgage bonds, and the contract had been made with the State in reference to such existing bonds, the words "an amount of first mortgage bonds" would undoubtedly have constituted the meaning claimed for it by the counsel for the applicants. But in the absence of any such state of things, it would be a very great abuse of reason to place upon a contract entered into for the *sole purpose of security*, a construction which would leave the lender almost entirely at the mercy of the borrower.

In order to gain for the words "*first mortgage bonds*," as used in the Constitution, the extended signification claimed by the Railroads, the counsel for the applicants argued that the provision having been framed while the eleventh and twenty-first sections of the charter of the Minnesota and Pacific Railroad Company were in full force, the words must have been used in direct reference to those sections, and as they give the power to the Company to issue an unlimited amount of bonds according to the necessities of the Company, the parties must have presumed that they intended to do so, or in other words, that as they possessed the power its exercise must be presumed.

These sections merely confer upon the Company the power to borrow money, and to give security by bond, mortgage or otherwise, as may be agreed upon by the parties they contract with. To a Company, whose wealth and resources are all in the nature of securities, and not money, such a power is absolutely necessary to the operation of the other powers granted. Without money, the institution cannot draw its first breath, and a charter without such powers, falls stillborn on the statute book. It is therefore merely to place the corporation on an equal footing with a natural person that such powers are granted. A corporation can exercise no powers except such as are conferred upon it by its charter, and those sections merely invest it with the ability to do what an individual could do of his own natural right. Nothing, therefore, can be inferred from this grant of power in support of the position

contended for by the applicants, that would not be equally applicable to an individual who possesses the same powers in his own right.

The counsel for the applicant treated the contract between the State and these Companies, as an ordinary commercial transaction, and did not claim for it any more favorable interpretation than such an instrument should receive. I am willing to be more liberal and admit that the State had more interest in the success of these Railroad enterprises, and stood more nearly connected to them than the ordinary relation of borrower and lender. But it must be a tender solicitude indeed, and a liberality bordering on romance, which would induce the State to make terms such as the counsel contended for.

I would not desire to say anything in this opinion which could be construed into a disparagement of the security which the State has under the holding of the Court, but merely contend that the Constitution entitled her to a much higher class.

Being satisfied that the construction placed upon the Constitution by the Governor is the correct one, and that the first mortgage bonds of the Company which were to be transferred to the State, should be an exclusive first lien on the road, lands and franchises of the Company, I am of the opinion, therefore, that the writ of mandamus should not issue, and that the application should be dismissed.