IN RE APPLICATION OF CITY OF WHITE BEAR LAKE
FOR PERMIT TO ENCROACH UPON
BAY OF BIRCH LAKE.
STATE v. CITY OF WHITE BEAR LAKE.

247 N. W. 2d 901.

November 19, 1976—No. 46058.

*Warren Spannaus*, Attorney General, *C. Paul Faraci*, Deputy Attorney General, and *William G. Peterson* and *A. W. Clapp III*, Special Assistant Attorneys General, for appellant.

*Newcome, Wallace & Newcome* and *Thomas W. Newcome*, for respondent.

Heard before Todd, Yetka, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This is an appeal from an order and judgment of the Ramsey County District Court which reversed an order of the commissioner of natural resources. The commissioner had denied a permit application of the city of White Bear Lake to encroach upon a bay of Birch Lake to construct a roadway.

In 1969 the city of White Bear Lake (hereinafter city) began action on a proposed route for County Highway No. 9 to conduct traffic around the city's central business district and link State Highways Nos. 61 and 96 near Birch Lake. Between 1969 and 1974 the city spent $50,000 on planning, designing, and land costs for the proposed route.

The Minnesota Legislature amended the so-called Minnesota Water Management Law[1] by passage of L. 1973, c. 315. Prior to that amendment, Minn. St. 1971, § 105.42, gave the state authority to control any activity which changed the course, current, or cross section of public waters. The 1973 amendment defined public waters as any waters of the state which serve a beneficial public purpose. L. 1973, c. 315, § 4 (Minn. St. 105.38[1]). L. 1973, c. 315, also amended Minn. St. 1971, § 105.45, to expressly state that in all permit applications the applicant has the burden of proving that the proposed project is reasonable, practical, and will adequately protect the public safety and promote the public welfare. L. 1973, c. 315, § 13.

---

[1] Minn. St. 1971, c. 105.

On February 27, 1974, the city filed its application under Minn. St. 105.42 for a permit to encroach upon Birch Lake. A public hearing was held on August 7 and 8, 1974. Prior to the hearing, the commissioner of natural resources (hereinafter commissioner) advised the city that if the proposal was found to cause environmental damage, then the hearing would also consider whether there were "feasible and prudent alternatives" to the proposal as required by Minn. St. 116D.04, subd. 6, of the so-called Minnesota Environmental Policy Act, Minn. St. c. 116D. Seven alternatives were considered at the hearing.

On November 22, 1974, the commissioner issued an order denying the city's application. The city appealed the order to Ramsey County District Court pursuant to Minn. St. 105.47, and the court reversed the commissioner's order on the grounds that it was arbitrary and capricious. The court held:

"I

"The Order of the Commissioner of the Department of Natural Resources dated November 22, 1974 is arbitrary, capricious, unjust, unreasonable and is not supported by the evidence.

"II

"The 'Ninth Street Extension Project,' as proposed, identified as Alternate I, across the bay of Birch Lake will protect the public safety and promote the public welfare and will not have a material adverse effect on the wetlands, wildlife habitat or the water quality of Birch Lake or of any other natural resources.

"III

"There is no other feasible, economical or prudent alternate route for location of the proposed roadway.

"IV

"The provisions of Chapter 315, Laws of Minnesota, 1973, amending M. S. A. 105.45 are not applicable to the 'Ninth Street Extension Project.'

"V

"The City of White Bear Lake is entitled to an Order of the

Commissioner of Natural Resources for a permit to construct the 'Ninth Street Extension Project' as proposed."

The issues presented on appeal are:

(1)   Did L. 1973, c. 315, create a higher standard for the granting of permits under the Water Management Law?

(2)   Was there sufficient evidence before the commissioner of natural resources to support the denial of a permit to encroach upon Birch Lake?

L. 1973, c. 315, amended Minn. St. 1971, § 105.37, by adding the following definition (L. 1973, c. 315, § 3):

"Subd. 7.   'Waters of the state' means any waters, surface or underground, except those surface waters which are not confined but are spread and diffused over the land. 'Waters of the state' includes all boundary and inland waters."

Minn. St. 1971, § 105.38, containing the declaration of policy, was amended as follows (L. 1973, c. 315, § 4):

"In order to conserve and utilize the water resources of the state in the best interests of the people of the state, and for the purpose of promoting the public health, safety and welfare, it is hereby declared to be the policy of the state:

"(1)   Subject to existing rights all waters (IN STREAMS AND LAKES WITHIN) *of* the state which (ARE CAPABLE OF SUBSTANTIAL) *serve a* beneficial public (USE) *purpose* are public waters subject to the control of the state. The public character of water shall not be determined exclusively by the proprietorship of the underlying, overlying, or surrounding land or on whether it is a body or stream of water which was navigable in fact or susceptible of being used as a highway for commerce at the time this state was admitted to the union. This section is not intended to affect determination of the ownership of the beds of lakes or streams.

"(2)   The state, to the extent provided by law from time to time, shall control the appropriation and use of surface and underground waters of the state.

"(3) The state shall control and supervise, so far as practicable, *any activity which changes or which will change the course, current, or cross-section of public waters, including but not limited to* the construction, reconstruction, repair, removal, or abandonment of dams, reservoirs, and all control structures in any of the public waters of the state." (Changes or additions indicated by italics, deletions by CAPITALS.)

The district court found that the above amendment made substantial changes in the requirements of municipalities, such as the city of White Bear Lake, to obtain permits for any projects which might affect public waters. The changes in the language of the law, however, do not justify such a conclusion. While the 1973 amendment expanded the definition of public waters, Birch Lake would constitute public waters under either the old or new definition because of the number and intensity of various uses of the lake. See, Nelson v. DeLong, 213 Minn. 425, 431, 7 N. W. 2d 342, 346 (1942).

The only specific language in the Water Management Law used by the district court for its ruling is a portion of a sentence added to a paragraph in Minn. St. 1971, § 105.45, relating to the commissioner's authority to issue permits and orders. The sentence in question is:

"* * * In all permit applications the applicant has the burden of proving that the proposed project is reasonable, practical, and will adequately protect public safety and promote the public welfare."

Whether or not the above amendment applies in this case, the city's burden is the same because the amendment is only a restatement of a well-established rule of administrative law. "In administrative proceedings, the general rule is that an applicant for relief, benefits, or a privilege has the burden of proof." 73 C. J. S., Public Administrative Bodies and Procedure, § 124. In this state the burden of proof generally rests on the one who seeks to show he is entitled to the benefits of a statutory provision. 7A Dunnell, Dig. (3 ed.) §§ 3468 and 3469.

There is not sufficient evidence to conclude that L. 1973, c. 315, created a higher standard for granting water permits. If the city had been ready to begin construction in 1973, it would still have been required to apply to the commissioner for a permit and to prove that the proposed construction would promote the public welfare. Because L. 1973, c. 315, did not create a higher standard, it is not necessary for this court to consider the question of whether the city has a vested right to use the former statutory procedure.[2]

The central issue in this case and the crux of the district court's ruling is whether the evidence which was presented to the commissioner justifies a denial of the permit to encroach upon Birch Lake. The district court's review of the commissioner's decision is restricted to the question of whether the decision is "lawful and reasonable" or "unjust, unreasonable, or not supported by the evidence." Minn. St. 105.47. This court noted in Minneapolis Van & Whse. Co. v. St. Paul Terminal Whse. Co. 288 Minn. 294, 299, 180 N. W. 2d 175, 178 (1970), that the substantial-evidence rule governs the scope of all judicial review of evidence supporting factual findings of administrative agencies:

"The burden is upon the appellant to establish that the findings of the commission are not supported by the evidence in the record, considered in its entirety."

See also, In re Lake Elysian High-Water Level, 208 Minn. 158, 293 N. W. 140 (1940).

---

[2] Without pursuing the question of vested rights in depth, we note that Monk & Excelsior, Inc. v. Minn. State Bd. of Health, 302 Minn. 502, 225 N. W. 2d 821 (1975), cited by the district court, does not support the conclusion that the defendant city had a vested right in the prior procedure and need not be subject to L. 1973, c. 315. In Monk, the corporation which sought to construct a nursing home without obtaining a certificate of need under a recently enacted statute actually had begun construction after repeated attempts to obtain prior approval of the Minnesota Department of Health.

The district court further concluded on the basis of this court's ruling in In re Certain School Districts, Freeborn County, 246 Minn. 96, 74 N. W. 2d 410 (1956), that it had authority to determine whether the commissioner's ruling was an abuse of discretion. The test for the commissioner to use in deciding whether to grant a permit under Minn. St. 105.45 is whether he "concludes that the plans of the applicant are reasonable, practical, and will adequately protect public safety and promote the public welfare * * *."

Among the commissioner's conclusions in this case were the following:

"1.   Project Alternate I, the applicant's preferred alternate will have material adverse effects on Birch Lake and the adjacent wetland areas as follows:

"a.   Alternate I encroachment into Birch Lake will reduce the water surface area of the lake and will bisect a small bay, thereby altering the remaining natural character of a lake already severed by previous highway construction.

"b.   Alternate I construction will degrade the water quality of the southwest bay of Birch Lake as well as Birch Lake itself. This degradation will accelerate the eutrophication of a lake which is already mildly eutrophic.

"c.   Alternate I encroachment into Birch Lake will destroy valuable wildlife habitat fringing the shoreline thus adversely affecting the lake's value for waterfowl production, nature study and bird-watching, furbearer trapping and wildlife feeding and protection.

"d.   Alternate I construction will eliminate five prime wetland areas thereby destroying valuable wildlife habitat and nutrient entrapment areas.

"2.   Project Alternates II, III, and IV will also have material adverse effects on Birch Lake and the adjacent wetland areas because of lake encroachment and/or wetland destruction similar to No. 1 above.

"3.   Other feasible and prudent alternatives have been pre-

sented which will cause little or no adverse impact on either Birch Lake or the adjacent wetland areas and which will function to bypass traffic away from downtown White Bear Lake and other existing residential areas, thereby satisfying the primary purpose of the project.

"a. Alternates V and VII will not encroach into Birch Lake, they will not produce major adverse effects on wetland areas, and they will not place added traffic pressures on existing residential streets.

"b. Alternate VI will require some shoreline modification of Birch Lake which will detract from the natural character of the lake. This alternate will also increase traffic in an existing residential area and is less desirable than either alternate V or VII.

"4. The conflicting and confusing testimony given relating to traffic count data, traffic generation areas and trunk highway/county road/city street systems indicates a strong need for re-evaluation of this bypass route concept. The State of Minnesota Highway Department should be involved because the proposals amount to a re-routing of a state highway.

"5. There is a strong indication that some unexplored alternates to the proposed construction still exist which would better serve the public safety and welfare and the State's paramount concern for its natural resources.

"6. Project alternate I does not promote the public welfare, because it will have material adverse effects on natural resources. There are feasible and prudent alternatives available which are consistent with the reasonable requirements of the public health, safety, and welfare and the State's paramount concern for the protection of its natural resources from pollution, impairment, or destruction."

Among the commissioner's factual findings supporting his conclusions were the following:

"* * * The roadway alignment will intersect or pass near fourteen wetland areas in addition to Birch Lake. These areas

include four Type II wetlands, eight Type III wetlands, and two Type IV wetlands.

"14. Five of the fourteen wetland areas will be eliminated by the proposed roadway construction. These include both Type III and Type IV wetlands.

"15. These wetlands are considered to have value for the storage of ground water, the retention of runoff water, the retention of nutrients, the reduction or prevention of erosion and lake sedimentation, maintaining open space, and for wildlife habitat.

"16. Wetland Types III and IV are considered by wildlife biologists to be the most valuable types of wetland areas for the nesting, feeding and resting of waterfowl.

\* \* \* \* \*

"20. Birch Lake and its adjacent wetland areas provide desirable habitat for various wildlife species which include mallards, blue-winged teal, loons, wood ducks, herons, bittern, egrets, muskrat, pheasants, hawks, owls, song birds, skunks and rabbits.

"21. The water quality of the southwest bay of Birch Lake is the same as that of the main lake which is presently in a mildly eutrophic condition.

"22. Construction of the roadway encroachment will directly downgrade the water quality of Birch Lake by disturbing highly organic bottom sediments and by increasing the erosion potential of inplace soils during and after grading.

"23. The proposed lake encroachment will indirectly downgrade the water quality because traffic across the roadway encroachment will produce chemical pollutants which will drain directly off the roadway and into the lake without benefit of filtration through natural wetland areas.

"24. The roadway encroachment into Birch Lake will eliminate a water surface area of 0.8 acres or about 10 percent of the bay.

"25. The roadway encroachment will sever the southwest bay

and produce a barrier to wildlife movement which will result in a substantial killing of resident species."

In reversing the commissioner, the district court in its memorandum stated that the evidence did not support the commissioner's findings and "[did] not even show a prima facie case which would warrant the issuance of [the commissioner's] order denying the permit * * *."[3] We cannot agree. There is substantial evidence in the record to support the commissioner's findings. The fact that the city has expended a substantial amount of money in preparation for an environmentally damaging project does not require that project's construction.

The commissioner's decision also is supported by Minn. St. c. 116D, the Minnesota Environmental Policy Act. Minn. St. 116D.04, subd. 6, provides in part:

"No * * * permit for natural resources management [shall] be granted, where such * * * permit has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare * * *. Economic considerations alone shall not justify such conduct."[4]

This statute was given a broad scope in County of Freeborn v. Bryson, 297 Minn. 218, 210 N. W. 2d 290 (1973), in which this court reversed a district court's denial of an injunction preventing a county from constructing a roadway which would elimi-

---

[3] The district court concluded that the Ninth Street Extension Project "will protect the public safety and promote the public welfare and will not have a material adverse effect on the wetlands, wildlife habitat or the water quality of Birch Lake or of any other natural resources." The court also concluded that, "There is no other feasible, economical or prudent alternate route for location of the proposed roadway."

[4] Minn. St. 116D.04, subd. 5, defines "[p]ermits for natural resources management" as including permits required under Minn. St. 105.42, which is the type of permit the city seeks here.

nate a portion of a marsh. After trial on remand, that case was again appealed to this court. In County of Freeborn v. Bryson, 309 Minn. 178, 188, 243 N. W. 2d 316, 321 (1976), we said:

"* * * Whether for highways or for numerous other reasons * * * it is a well-known fact that marshes have been drained almost indiscriminately over the past 50 years, greatly reducing their numbers. The remaining resources will not be destroyed so indiscriminately because the law has been drastically changed by the Act. Since the legislature has determined that this change is necessary, it is the duty of the courts to support the legislative goal of protecting our environmental resources."

Other alternate routes were approved by the commissioner and remain available to the city. While the trial court concluded that the other alternatives were not feasible, the record again reasonably supports the commissioner's conclusion. The city's argument that no other alternative will be equally as effective as a traffic bypass does not mean that the commissioner's finding that other routes are feasible and prudent was arbitrary and capricious. We would anticipate that the city will reapply to the commissioner for a hearing on other permits necessary for the construction of one of the alternative roadways and will also seek the involvement of the State Highway Department.

Reversed.