ALL PARKS ALLIANCE FOR CHANGE, Appellant,

v.

UNIPROP MANUFACTURED HOUSING COMMUNITIES INCOME FUND, d/b/a Ardmor Village, Respondent.

No. A05–912.

Supreme Court of Minnesota.

May 24, 2007.

Rehearing Denied Aug. 2, 2007.

Kay Nord Hunt, Barry A. O'Neil, Valerie Sims, Lommen, Nelson, Cole, King & Stageberg, P.A., Minneapolis, MN, for Appellant.

John F. Bonner, III, Robyn K. Johnson, Thomas F. DeVincke, Bonner & Borhart LLP, Minneapolis, MN, for Respondent.

Teresa Nelson, American Civil Liberties Union of MN, St. Paul, MN, Elizabeth Melton, Ailana McIntosh, Foley & Mansfield, PLLP, Minneapolis, MN, for amicus American Civil Liberties Union of MN.

Timothy L. Thompson, St. Paul, MN, for amicus Housing Preservation Project.

## OPINION

MEYER, Justice.

Respondent Uniprop Manufactured Housing Communities Income Fund operates a manufactured home park in Lakeville, Minnesota, known as Ardmor Village. In response to informational leafleting in the park by appellant All Parks Alliance for Change (APAC), respondent Uniprop instituted a rule banning noncommercial solicitation within the park except between the hours of 11 a.m. and 6 p.m., Monday through Friday. In addition, respondent instituted a "no-contact" list of residents, maintained in the park's management office. After a court trial, the district court ordered that the time during which noncommercial solicitation is permitted be expanded to include Saturdays, and extended the solicitation period to 7 p.m. between May and August. The court of appeals affirmed both the "no-contact" list and the solicitation period established by the district court. We are asked to decide whether the limits placed by the district court on noncommercial speech within the park are "reasonable limits as to time, place and manner" under Minn.Stat. § 327C.13 (2006). We affirm.

Ardmor Village consists of 339 home sites, approximately 280 of which were occupied at the time of trial. Ardmor Park residents are governed by a set of covenants covering such things as occupancy limits, home maintenance, pets, and use of community facilities. Prior to the institution of this lawsuit, the park's covenants prohibited "peddling, soliciting or conducting any commercial enterprise or profession" within the park but did not regulate noncommercial speech or solicitation.

On April 15, 2003, two volunteers for APAC visited the park. APAC is a Minnesota nonprofit organization formed to educate residents of manufactured home parks about their rights under Minnesota law. The volunteers left flyers, in English and Spanish, on residents' doorsteps describing APAC and its services and announcing upcoming informational meetings, to be conducted by APAC, concerning the rights of residents of manufactured home parks under Minnesota law. Ardmor Village's manager confronted the volunteers, told them that soliciting was not permitted in the park, and called the Lakeville police when the volunteers would not leave of their own accord.

In June 2003, volunteers for APAC again visited the park to pass out flyers and again were told to leave. The park manager gave the APAC volunteers a map of the park so that APAC could distribute its leaflets by direct mail, but the map did not indicate which home sites were occupied, nor did the map give the names of residents. APAC mailed flyers to the addresses on the map, but at least 70 of the mailings were returned as undeliverable.

In February 2004, APAC filed suit against respondent Uniprop seeking an order permitting it to distribute leaflets and otherwise "exercise its right of free expression" within the park "during regular business hours and early evenings." APAC also claimed that park management's actions violated Minn.Stat. § 327C.13, which bars manufactured home park owners from prohibiting the exercise of the right of free expression for noncommercial purposes within parks, but permits park owners to enforce rules that set "reasonable limits as to time, place and manner" of noncommercial speech. APAC sought an injunction, actual damages in the amount of $590.16 (its costs of the leaflet mailing to park residents), costs, investigation fees, and reasonable attorney fees under Minn.Stat. §§ 327C.15 and 8.31, subds. 1 and 3(a) (2006). APAC also moved for an injunction barring Uniprop from preventing it from leafleting, canvassing, and organizing residents of the park. By order filed on April 2, 2004, the district court issued a temporary restraining order barring Uniprop from interfering with APAC's leafleting, canvassing, and organizing of residents between the hours of 9 a.m. and 8 p.m., Monday through Saturday. The matter was set for trial in November 2004.

In August 2004, Uniprop distributed to park residents a notice of rule change. Under the revised rule: "Leafleting and canvassing is permitted on Monday through Friday between the hours of 11:00 a.m. and 6:00 p.m. in the Ardmor Village community for noncommercial purposes only." In addition, the park instituted a "no-contact" list comprised of "those residents that have chosen not to allow any leafleting, canvassing or door to door solicitation of any kind, regardless of purpose, at their home site." The rule required any individual wishing to distribute leaflets, canvass, or solicit door-to-door within the park to review the "no-contact" list in the community office in advance.

After a court trial, the district court found that the new rule limiting noncommercial speech unreasonably curtailed APAC's outreach efforts and presented an unreasonable impediment to forming a resident association. The court found that Uniprop's interest in promoting residents' quiet and peaceful use of the community was compelling, but concluded that the new rule was not narrowly drawn to achieve that end. The court further concluded that the new rule was not reasonable "in that it would restrict APAC from being able to directly contact residents during the times in which residents are most likely to be home, i.e. on Saturdays during the day." The court permanently enjoined Uniprop from interfering with APAC's activities during the hours of 11 a.m. to 6 p.m., Monday through Saturday, from September 1 to April 30 of each year. Between May 1 and August 30, the solicitation period was extended by one hour, to 7 p.m. But the district court upheld the institution of the no-contact list and ordered Uniprop to provide it to APAC on the first day of every other month. Finally, the district court awarded APAC monetary damages in the amount of $590.16 and its attorney fees, costs, and disbursements.

On appeal, the court of appeals affirmed. *All Parks Alliance for Change v. Uniprop Manufactured Hous. Cmtys. Income Fund*, No. A05–912, 2006 WL 618932 (Minn.App. Mar.14, 2006). The court rejected APAC's argument that Minn.Stat. § 327C.13 incorporates First Amendment principles. *Id.* at *4. The court also rejected APAC's argument that there were other means by which the district court could have protected residents' rights that would have been less restrictive of APAC's ability to solicit residents. *Id.* at *5. The court concluded that section 327C.13 requires

only that limitations on noncommercial speech be reasonable, and the court concluded that the limits imposed by the district court were reasonable. *Id.*

We are asked to decide whether the limits placed by the district court on noncommercial solicitation within the park are "reasonable limits as to time, place and manner" under Minn.Stat. § 327C.13. Because this case comes before us following a court trial, our review would ordinarily be limited to determining whether the evidence as a whole fairly supported the district court's conclusions of law and judgment. *Viking Automatic Sprinkler Co. v. Viking Fire Prot. Co.*, 280 Minn. 250, 256, 159 N.W.2d 250, 254 (1968). But neither party in this case has challenged any of the district court's findings of fact. Accordingly, our review is further limited to whether the district court's conclusions of law are supported by its findings of fact and whether the district court erred in its conclusions of law. The application of the law to undisputed facts is subject to de novo review. *Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 402 (Minn.1996).

Neither party challenged on appeal the authority of the district court to rewrite or "blue-pencil" the rule as instituted by park management, and we therefore assume (without deciding) that in altering the rule the district court acted properly. We have previously approved of the judicial modification of noncompete agreements to fit the law. *See, e.g., Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n. 8 (Minn.2002); *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n. 1 (Minn.1980). We did so on the theory that in blue-penciling the agreement the court "is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties." *Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn.1977) (citing 6A Corbin, Contracts, § 1390). The Ardmor Village covenants are considered part of the contract between the resident and Uniprop under Minn.Stat. § 327C.02 (2006). But because the parties did not dispute the authority of the district court to blue-pencil the park rule, we are not asked to decide whether the blue-pencil doctrine extends beyond noncompete agreements to other types of contracts, and we express no opinion on the subject.

In order to decide whether the limits on noncommercial speech as rewritten by the district court are reasonable, we must first determine the scope of "reasonable limits as to time, place and manner." In statutory interpretation, our first inquiry is whether the statute is ambiguous. Minn.Stat. § 645.16 (2006); *Zurich Am. Ins. Co. v. Bjelland*, 710 N.W.2d 64, 68 (Minn.2006). A statute is ambiguous if it is reasonably susceptible to more than one interpretation. *Hutchinson Tech., Inc. v. Comm'r of Revenue*, 698 N.W.2d 1, 8 (Minn.2005).

The statute at issue in this case, Minn.Stat. § 327C.13, provides:

No park owner shall prohibit or adopt any rule prohibiting residents or other persons from peacefully organizing, assembling, canvassing, leafletting or otherwise exercising within the park their right of free expression for noncommercial purposes. A park owner may adopt and enforce rules that set reasonable limits as to time, place and manner.

Section 327C.13 itself provides no definition of "reasonable limits as to time, place and manner." But in determining the intent of the legislature as to what constitutes "reasonable limits as to time, place and manner" we are not limited to the language of section 327C.13 alone. Rather, we interpret each section in light of its surrounding sections, in order to avoid conflicting interpretations of the statute.

*Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). In particular, statutory definitions of words used elsewhere in the statute furnish authoritative evidence of the legislature's intent and meaning. *See Bd. of Ed. of Minneapolis v. Sand,* 227 Minn. 202, 210, 34 N.W.2d 689, 694 (1948).

Chapter 327C, titled "Manufactured Home Park Lot Rentals," includes several provisions that inform the meaning of "reasonable limits as to time, place and manner." First, section 327C.01, subd. 8 (2006), defines a "reasonable rule" as a park rule:

(a) which is designed to promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the efficient operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities;

(b) which is reasonably related to the purpose for which it is adopted;

(c) which is not retaliatory or unjustifiably discriminatory in nature;  and

(d) which is sufficiently explicit in prohibition, direction, or limitation of conduct to fairly inform the resident of what to do or not to do to comply.

Second, sections 327C.02, subd. 2 (2006), and 327C.05, subd. 1 (2006), bar a park owner from adopting or enforcing unreasonable rules. Section 327C.05, subd. 3 (2006), allows a court to declare unreasonable any park rule "if the court finds that the rule fails to meet the standard of section 327C.01, subdivision 8," referring to the definition of "reasonable rule." Finally, section 327C.02, subd. 2, bars a park owner from enforcing a rule that is a "substantial modification" of the resident's original rental agreement. Section 327C.01, subd. 11 (2006), defines "substantial modification":

"Substantial modification" means any change in a rule which: (a) significantly diminishes or eliminates any material obligation of the park owner;  (b) significantly diminishes or eliminates any material right, privilege or freedom of action of a resident;  or (c) involves a significant new expense for a resident.

Taken together, these provisions of chapter 327C mean that the limits on solicitation and other noncommercial speech within Ardmor Park must be reasonable (as defined by section 327C.01, subd. 8) and cannot represent a "substantial modification" of residents' rental agreements (as defined by section 327C.01, subd. 11). Specifically, any limits placed by Uniprop on solicitation and other noncommercial speech within the park: (1) must be designed to either promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities; (2) must be reasonably related to the purpose for which they were adopted; (3) must not be retaliatory or unjustifiably discriminatory in nature; (4) must be sufficiently explicit in prohibition, direction, or limitation of conduct to fairly inform residents of what to do or not to do to comply; and (5) cannot significantly diminish or eliminate any material right, privilege, or freedom of action of a resident. If the limits placed by Uniprop on noncommercial speech within Ardmor Village do not satisfy these requirements, the statute renders them unenforceable.[1]

---

1. APAC urges us to apply First Amendment principles to our analysis of the park's restrictions on noncommercial speech. We decline to do so. We apply First Amendment principles only to "state actors," and there is no indication on this factual record that Uniprop

■ Having ascertained the meaning of "reasonable limits as to time, place and manner," we review the district court's application of those limits to the undisputed facts, as the district court found them. We conclude that the district court's limits on noncommercial speech and solicitation within Ardmor Village are reasonable as to time, place and manner under Minn.Stat. § 327C.13.

■ First, as to whether the park's rule was "designed to promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the efficient operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities," as required by Minn.Stat. § 327C.01, subd. 8(a), the district court concluded that Uniprop's interest in promoting the "quiet and peaceful use of the community" was "compelling." But on the second prong of the test, whether the rule was "reasonably related to the purpose for which it is adopted," the district court approved the "no-contact" list instituted by Uniprop but found that the time limits as promulgated by Uniprop were "not narrowly drawn" to achieve the purpose for which they were adopted. APAC did not claim that Uniprop promulgated the rule in retaliation for its activities within the park, the third prong of the statutory standard. Although a Uniprop witness testified at trial that the rule was instituted in response to APAC's activities within the park, Uniprop had previously barred any solicitation by APAC at any time. Therefore, a rule permitting APAC to solicit park residents, even during limited periods, cannot be seen as "retaliatory," as that term is generally construed, because the new rule permitted something that Uniprop previously

did not allow. APAC did not dispute that the rule as promulgated by Uniprop was sufficiently explicit to fairly inform residents of what to do to comply, and therefore satisfied the fourth prong of the statutory standard.

Having found that the time limits established by Uniprop for noncommercial speech and solicitation within the park were not reasonably related to the purpose for the limits, the district court blue-penciled the rule to achieve limits that, in the district court's view, were reasonable. The court expanded the periods during which noncommercial speech and solicitation are permitted in the park to include an extra hour during the summer months and permitted solicitation and canvassing on Saturdays. In addition, while upholding the institution of the "no-contact" list, the court required Uniprop to provide a copy of the list to APAC six times a year. Finally, in response to APAC's concerns that residents were being improperly coerced or persuaded to sign the "no-contact" list, the court specifically allowed APAC to petition for an evidentiary hearing once 25% of the occupied units had signed on to the list.

We agree with the court of appeals that the rule as rewritten by the district court imposes reasonable limits on the time, place, and manner of noncommercial speech within Ardmor Park. We therefore affirm the court of appeals with respect to the limits on noncommercial speech and solicitation within Ardmor Park, and we hold that the limits as rewritten by the district court are "reasonable limits as to time, place and manner" under Minn.Stat. § 327C.01, subd. 8.

Affirmed.

should be considered a "state actor" in the same way that a "company town" was deemed to be a state actor in *Marsh v. Ala-*

*bama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

PAGE, Justice (dissenting).

While the district court did not make an explicit finding that Uniprop's rules violated section 327C.13, in order for the district court to have amended Uniprop's rule restricting noncommercial speech, it had to have found that Uniprop's rule was in violation of the statute. Absent a statutory violation, the district court had no authority to modify the rule. In upholding the district court's modification of the rule as a reasonable restriction on noncommercial speech, this court by necessity concludes that the rule adopted by Uniprop violated section 327C.13's prohibition against unreasonable time, place, and manner restrictions on the right to free expression for noncommercial purposes. I agree with that implicit conclusion, but I do not agree with this court's conclusion that the district court's modifications to the rule cure that violation.

Minnesota Statutes § 327C.13 (2006) provides that:

> No park owner shall prohibit or adopt any rule prohibiting residents or other persons from peacefully organizing, assembling, canvassing, leafletting or otherwise exercising within the park their right of free expression for noncommercial purposes. A park owner may adopt and enforce rules that set reasonable limits as to time, place and manner.

APAC argues that in enacting section 327C.13 the legislature intended First Amendment principles to apply in determining whether a manufactured park owner's rule violates free expression. APAC further argues that, in applying First Amendment principles to the facts of this case, Uniprop's restriction, even as modified by the district court, cannot stand. Uniprop argues that its rule does not violate the statute and that the legislature did not intend for First Amendment principles to apply when reviewing the reasonableness of a park rule. Although Uniprop does not press the argument here, at the district court, Uniprop argued that to apply First Amendment principles to determine whether its rule violates the statute would result in a constitutional violation.

Our review of a lower court's construction of a statute is de novo. *Olmanson v. LeSueur County*, 693 N.W.2d 876, 879 (Minn.2005). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006). "When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.* However, when there is ambiguity we ascertain the legislature's intent by considering the following factors:

> (1) the occasion and necessity for the law;
>
> (2) the circumstances under which it was enacted;
>
> (3) the mischief to be remedied;
>
> (4) the object to be attained;
>
> (5) the former law, if any, including other laws upon the same or similar subjects;
>
> (6) the consequences of a particular interpretation;
>
> (7) the contemporaneous legislative history; and
>
> (8) legislative and administrative interpretations of the statute.

Minn.Stat. § 645.16. In doing so, the statute's words and phrases are to be "construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a special meaning * * * are construed according to such special meaning." Minn.Stat. § 645.08 (2006). When the legislature

uses terms of art that have "accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind." *Morissette v. U.S.,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *see also Minn. & P.R. Co. v. Sibley,* 2 Minn. 13, 19, 2 Gil. 1, 8 (Minn.1858) ("When terms of art or peculiar phrases are used, it must be supposed they are used in the sense as understood by persons familiar and acquainted with such terms.").

In 1973, the legislature enacted an act regulating manufactured home lot rentals. Act of May 18, 1973, ch. 295, §§ 1–7, 1973 Minn. Laws 567–69 (codified at Minn.Stat. §§ 327.41–.47 (1974)). Because of what it termed "major abuses of power," the legislature amended chapter 327 in 1979. *See* Office of Sen. Gene Merriam, Memorandum re. S.F. No.1918, 1982 Minn. Leg., at 2. The legislature again amended chapter 327 in 1982 to address what Senator Gene Merriam, one of the sponsors of the senate bill, deemed "major problems." *Id.; see* Act of March 22, 1982, ch. 526, 1982 Minn. Laws 938, 938–72. The 1982 amendments grew out of an interim study conducted by the House Subcommittee on Housing that included public hearings attended by more than 800 people, which produced more than 15 hours of public testimony. Office of Sen. Gene Merriam, Memorandum re. S.F. No.1918, 1982 Minn. Leg., at 3. The 1982 amendments reflect the concerns voiced by citizens at the public hearings. As background for amending chapter 327C, Senator Merriam noted:

> The manufactured home park owner also has an unusual status. Not simply a private land owner or an ordinary landlord, the park owner has come to resemble a private government. Park rules control a wide spectrum of resident conduct, ranging from the length that grass may be allowed to grow, to whether a homemaker can earn some extra income by babysitting neighborhood children, to how many people can live in each private home. In short, a park owner is like an unelected mayor of a bedroom community.

*Id.* at 1.

Given the legislative history, it is clear that the occasion for the 1982 amendments to chapter 327C, including the enactment of section 327C.13, arose out of continuing legislative concerns about the imbalance of power between manufactured home park owners and park residents. It is also clear that the mischief the legislature sought to remedy was the abuse of power by manufactured home park owners and the object to be obtained was to rectify the imbalance between manufactured home park owners and park residents. Finally, it is clear from the legislative history that, in enacting section 327C.13 as a tool for rectifying that imbalance, the legislature intended to subject restrictions placed on speech by park owners to First Amendment principles. As an author of the amendments, Senator Merriam explained that the proposed amendments were in response to reports of abuses of power connected to this "form of private government." *Id.* at 2. He further described manufactured home park owners as being akin to the "unelected mayor of a bedroom community." *Id.* at 1. These references strongly suggest that in enacting section 327C.13 the legislature intended for the First Amendment to apply.[1] That suggestion is

---

1. Although the First Amendment does not govern the right to free expression within a manufactured home park, the U.S. Supreme Court has expressly recognized that the state

buttressed by the language used in the statute.

It is no coincidence that, in placing limits on the rights of manufactured home park owners to interfere with the rights of park residents, the legislature used words, phrases, and concepts derived directly from First Amendment jurisprudence. The words, phrases, and concepts embodied in "free expression," "noncommercial," "peacefully organizing, assembling, canvassing, leafletting," and "reasonable limits as to *time, place and manner,*" when used in reference to limitations on free expression, are all terms of art with special meaning under the First Amendment. Accordingly, I would hold that section 327C.13 extends the application of the First Amendment to manufactured home parks.

In my view, however, this case does not turn on whether we analyze the rule under the First Amendment. I conclude that the rule as modified is unreasonable and violates the statute no matter what standard we apply. As a preliminary matter, as I read the statute, the burden of proving the reasonableness of the restriction at issue in this case lies with Uniprop. " '[T]he burden of proof generally rests on the one who seeks to show he is entitled to the benefits of a statutory provision.' " *Rehn v. Fischley,* 557 N.W.2d 328, 333 (Minn.1997) (quoting *In re Application of City of White*

*Bear Lake,* 311 Minn. 146, 150, 247 N.W.2d 901, 904 (1976)). The ability to *adopt and enforce* rules that set reasonable time, place, and manner restrictions on free expression is a benefit conferred by section 327C.13. Thus, in order to prevail, Uniprop has the burden of proving that its rule is reasonable.

Minnesota Statutes § 327C.01, subd. 8 (2006), defines what constitutes a reasonable rule under section 327C.13. Under subdivision 8, "reasonable rule" means a park rule that meets all four of the following requirements:

> (a) it is designed to promote the convenience, safety, or welfare of the residents, promote the good appearance and facilitate the efficient operation of the park, protect and preserve the park premises, or make a fair distribution of services and facilities;
>
> (b) it is reasonably related to the purpose for which it is adopted;
>
> (c) it is not retaliatory or unjustifiably discriminatory in nature; and
>
> (d) it fairly informs the resident of what to do or not to do to comply.

On the record presented, Uniprop's rule fails this definition.

The problem here is that Uniprop has failed to meet its burden of showing that its rule is reasonably related to the purpose for which it was adopted. Uniprop

has the authority to exercise its police power or sovereign right to provide the right to free expression by way of its state constitution or by statutory provision. *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). "It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." *Id.* The Supreme Court concluded in *PruneYard*

that a provision of the California Constitution providing the public with a right to engage in free expression at a privately owned shopping mall did not amount to a constitutional taking. *Id.* at 83, 100 S.Ct. 2035. Although the provision infringed on the mall owners' right to exclude, the provision did not amount to a constitutional taking because the exercise of free expression on mall property did not significantly diminish the property value and the property owners maintained the right to adopt time, place, and manner regulations that would minimize interference with commercial functions. *Id.*

asserts two reasons for adopting its rule limiting noncommercial speech: (1) to promote the residents' peaceful enjoyment of their property; and (2) to further its interest in maintaining a safe neighborhood. There is no question that the reasons asserted by Uniprop are, in the abstract, of the type contemplated by the legislature in enacting section 327C.01, subdivision 8(a). However, there is no evidence in the record indicating that Ardmor Village residents lacked peaceful enjoyment of their property or that the park was unsafe as a result of canvassing or leafleting. Nor is there any evidence in the record suggesting that such canvassing or leafleting was a threat to residents' peaceful enjoyment of their property or the safety of the park. Indeed, there is no evidence in the record explaining or demonstrating how limiting canvassing or leafleting promotes residents' peaceful enjoyment or furthers public safety. Absent a showing of the problems to be remedied and how the restrictions imposed by Uniprop remedy those problems, it is impossible to say that the restrictions on free expression are reasonably related to the purpose for which they were adopted as required by Minn.Stat. § 327C.01, subd. 8(b).

Uniprop's restrictions on noncommercial speech also fail as unreasonable under subdivision 8(c) because they are retaliatory in nature. At the time APAC began distributing information about its organizing efforts at Ardmor Village, the only rule limiting speech at Ardmor was contained in the village's community covenants.[2] That rule only restricted business activities by residents. No covenant or other rule regulated the exercise of free expression within Ardmor Village. Therefore, when Ardmor management had APAC removed from the park, it did so in violation of Ardmor's own rules and regulations.[3] After Ardmor management had APAC removed from the park, APAC obtained a temporary injunction enjoining Uniprop from denying it access to the park. In response to that injunction and APAC's litigation, Uniprop amended the community covenants for Ardmor Village to limit noncommercial speech, as Manager McGaffey admitted:

[Question]: Now the new policy in fact was prompted by what happened with APAC, correct?

[Answer]: Correct.

[Question]: And this I think you—there are also other solicitors. I think from your depositions some Jehovah Witness people have been out to the park?

[Answer]: Correct.

[Question]: But the policy wasn't changed because of the meat salesmen or the Jehovah Witnesses that were in the park, correct?

[Answer]: No, they did not prompt us to change our policy.

A rule adopted for the purpose of restricting the ability of an organization like APAC that provides information to manu-

2. The list of prohibited conduct in the Ardmor Community Covenants includes the following: "**Business Activities**: Peddling, soliciting or conducting any commercial enterprise or profession, by a Resident anywhere within the Community is not permitted."

3. During trial, Ardmor Village Manager Mary McGaffey testified that when Ardmor management had APAC removed from the park it did so pursuant to a policy prohibiting door-to-door canvassing and leafleting. McGaffey further testified that the rule prohibiting canvassing and leafleting within the park applied in the same way to commercial and noncommercial purposes. There is no evidence in the record to support McGaffey's testimony that, at the time APAC was first removed from Ardmor Village, Ardmor had a rule in place prohibiting noncommercial soliciting or canvassing.

factured home park residents about their rights as residents without any indication that the organization has interfered with the residents' quiet enjoyment of their property, engaged in illegal or otherwise disruptive activities, or created an unsafe condition in the manufactured home park is retaliatory and per se unreasonable. The district court's modifications to Uniprop's rule does not change that fact.

Further, Uniprop's restrictions are unreasonable because they impede the ability of APAC and organizations like it to communicate with residents about their rights as residents in manufactured home parks. Such communications are the type of communication the legislature had in mind when it enacted chapter 327C's free expression provisions. To allow the owner of a manufactured home park to adopt a rule specifically for the purpose of restricting the ability of park residents to receive information about their rights effectively frustrates the purposes of section 327C.13. Because Uniprop's rule is contrary to the intent of the legislature and frustrates the purposes of section 327C.13, Uniprop's rule, even as modified, cannot be allowed to stand.

Finally, the restrictions contained in Uniprop's rule violate residents' rights under section 327C.13 because they close off the possibility of both anonymous and spontaneous speech. Under Uniprop's rule, anyone seeking to engage in free expression involving canvassing or leafleting within the park must first present himself or herself to park management to view the no-contact list. Beyond stifling anonymity and spontaneity, Uniprop's restrictions are stunning in their overbreadth. In cutting off anonymous and spontaneous speech, Uniprop's rule restricts politicians seeking to go door-to-door to solicit votes, residents who would speak out in opposition to the actions of park management, a neighborhood association soliciting participation in a neighborhood watch group, and trick-or-treaters seeking to go door-to-door on Halloween in the same manner that it restricts APAC. This cannot be what the legislature had in mind when it enacted section 327C.13.

For all of the above reasons, I conclude that Uniprop's rules, even as modified by the district court, are unreasonable and in violation of section 327C.13.

Therefore, I respectfully dissent.

ANDERSON, Paul H., J. (dissenting).

I join in the dissent of Justice Page.